1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERESA MACCLELLAND, et al.,

            Plaintiffs,

    v.

CELLCO PARTNERSHIP, et al.,

            Defendants.

Case No.  21-cv-08592-EMC

**ORDER DENYING DEFENDANTS'
MOTION TO COMPEL
ARBITRATION AND STAY
PROCEEDINGS, AND DENYING
DEFENDANTS' REQUEST FOR
LEAVE TO FILE NOTIFICATION OF
CHANGE TO CUSTOMER
AGREEMENT**

Docket Nos. 20, 43

## I.      INTRODUCTION

Plaintiffs, individually, as private attorneys general, and on behalf of a putative class of other customers similarly situated, allege that Defendants Cellco Partnership d/b/a Verizon Wireless and Verizon Communications Inc. (collectively, "Verizon"), engaged in false advertising by failing to disclose an "Administrative Charge" for wireless services, and misrepresenting that the fee is a tax or government regulation.  Plaintiffs assert claims under California law pursuant to the Consumer Legal Remedies Act, False Advertising Law, and Unfair Competition Law seeking public injunctive relief, private injunctive relief, and restitution.

Now pending is Verizon's motion to compel the entirety of the action to arbitration subject to an arbitration agreement that prohibits non-individualized relief.  Docket No. 20 (Motion to Compel Arbitration, or "MTC").  For the following reasons, the Court **DENIES** Verizon's motion to compel arbitration.

///

///

## II.   BACKGROUND

A.   Summary of Allegations

In the operative complaint, Plaintiffs allege that Verizon has engaged, and continues to engage, in a false advertising scheme because Verizon publicly advertises flat monthly rates for its wireless service plans but then charges higher rates "by padding the bill with an invented and undisclosed" extra charge of $1.95 per month (which Verizon calls the "Administrative Charge"). *See* Docket No. 10 (First Amended Complaint or "FAC") ¶ 1.  The FAC alleges that the "Administrative Charge" was concocted by Verizon beginning in September 2005 as a means to covertly increase customers' rates.  *Id.* ¶¶ 1–2.  Since 2005, Verizon has allegedly improperly collected over $1 billion in additional charges from its California subscribers through use of Administrative Charges.  *Id.* ¶ 2.

Plaintiffs bring claims individually, as private attorneys general, and on behalf of a putative class consisting of "[a]ll individual consumers in California who currently subscribe or formerly subscribed to a postpaid wireless service plan from Verizon and were charged what Verizon labeled an 'Administrative Charge' within the applicable statutes of limitations."  *Id.* ¶ 501.  Plaintiffs bring claims under the Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.*, False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq. Id.* ¶¶ 511–567.  As an alternative to their statutory claims, Plaintiffs also bring a claim alleging breach of the implied covenant of good faith and fair dealing.  *Id.* ¶ 569.  The FAC seeks public injunctive relief to stop Verizon's allegedly ongoing false and deceptive price advertising to the general public under the UCL, FAL, and CLRA.  *Id.* ¶¶ 531, 548, 566, Prayer § A.  Under the CLRA, FAL, and UCL, Plaintiffs also seek, on behalf of themselves and the proposed class, restitution, damages, attorneys' fees, and a private injunction ordering Verizon to "adequately and accurately disclose to its subscribers the existence of the Administrative Charge, its true nature or basis, and its amount, including on all of Verizon's customer bills."  Prayer § B, C.

B.   Procedural Background

On November 3, 2021, Plaintiffs Teresa MacClelland, Karen Umberger, and Scott Willits

United States District Court
Northern District of California

1  filed the complaint.  Docket No. 1.  On November 10, 2021, Plaintiffs sent a demand letter to

2  Verizon that described their claims and this dispute.  Docket No. 29 (Opposition to Motion to

3  Compel, or "MTC Opp.") at 8.  On December 31, 2021, Plaintiffs filed the operative FAC, adding

4  24 additional Plaintiffs.  Docket No. 10.  Verizon then moved to compel arbitration and stay

5  proceedings.  Docket No. 20.  On May 19, 2022, the Court heard oral argument regarding

6  Verizon's motion to compel arbitration.  Docket No. 42.  Almost three weeks later, Verizon

7  requested leave to file a "notification of change" to Verizon's Customer Agreement

8  ("Agreement") that addressed a statute of limitations issue that the Court had raised during the

9  hearing.  Docket No. 43.  Plaintiffs then filed an opposition to Verizon's motion for leave.  Docket

10  No. 46.  On June 23, 2022, the Court granted leave for the parties to submit supplemental briefing

11  to address *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022).  Docket No. 50.

12  C.      Arbitration Agreement

13         Before activating his or her wireless service, each plaintiff was required to accept the

14  Agreement.  Docket No. 21 (Declaration of Lacey Kennedy, or "Kennedy Decl.") ¶¶ 3–5.  Over

15  time, Verizon has made minor adjustments to its Agreement over time, but every version of the

16  Agreement contained an arbitration clause that required arbitration and expressly prohibited class

17  arbitrations.  MTC at 3; Docket No. 21-1 (Agreement) ¶ 3.

18         Plaintiffs do not dispute that they assented to the arbitration agreement.  MTC Opp. at 8.

19  Nor do they contest Verizon's legal argument that their claims fall within the scope of the

20  arbitration clause.  *Id.* at 8.  Instead, Plaintiffs argue that the dispute resolution provisions are

21  permeated with unconscionability and are thus unenforceable.  *Id.* at 8.  The relevant provisions of

22  the Agreement are excerpted and discussed below.

23                          **III.      LEGAL STANDARD**

24         Neither party disputes the application of the Federal Arbitration Act ("FAA").  Under the

25  FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such

26  grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The final

27  clause of § 2, its saving clause, "permits agreements to arbitrate to be invalidated by 'generally

28  applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that

United States District Court
Northern District of California

3

apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011) (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

## IV.   <u>DISCUSSION</u>

In ruling on a motion to compel arbitration, a district court must decide "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "If the response is affirmative on both counts, then [absent application of the savings clause] the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id.*

Accordingly, the Court will first address whether there is an arbitration agreement between the parties.

### A.   <u>Whether An Agreement to Arbitrate Exists</u>

The initial question of whether an agreement to arbitrate exists has a simple answer. Plaintiffs do not dispute that the Agreement, and its arbitration provision, constitute an agreement to which they assented. MTC Opp. at 8. Before activating his or her wireless service, each plaintiff was required to accept the Agreement. Kennedy Decl. ¶¶ 3–5. While Verizon has made minor adjustments to its Agreement over time, every version of the Agreement contained an arbitration clause that required arbitration and expressly prohibited class arbitrations. MTC at 3; Agreement ¶ 3.

Accordingly, an agreement to arbitrate exists.

### B.   <u>Whether Plaintiffs' Claims Are Covered By the Agreement</u>

The next question is whether Plaintiffs' claims are within the scope of the arbitration agreement. This again has a straightforward answer—Plaintiffs do not contest Verizon's legal argument that their claims fall within the scope of the arbitration clause. MTC Opp. at 8.

Instead, Plaintiffs argue that the dispute resolution provisions are permeated with unconscionability and are thus unenforceable. *Id.* Verizon responds that the parties agreed to delegate the interpretation and enforcement of the Agreement to the arbitrator, so any questions of

United States District Court
Northern District of California

1   unconscionability must be determined by the arbitrator in the first instance.  Reply at 2–3.  The

2   Court now turns to the threshold question of delegation of arbitrability.

3   C.      Delegation of Arbitrability

4           Verizon presents two arguments regarding the purported delegation of arbitrability.  First,

5   on reply, Verizon argues for the first time that all of Plaintiffs' arguments about contract invalidity

6   must be decided in the first instance by the arbitrator given the arbitration provision's

7   incorporation by reference of the AAA rules.  *See* Reply at 1 (contending that the arbitration

8   clause's incorporation of the AAA rules is "clear and unmistakable evidence" that the parties

9   intended to delegate challenges to arbitrability to the arbitrator).

10          In general, "whether the court or the arbitrator decides arbitrability is 'an issue for judicial

11  determination unless the parties clearly and unmistakably provide otherwise.'"  *Oracle Am., Inc. v.*

12  *Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (citation and internal quotation marks

13  omitted).  There is no presumption in favor of arbitration of arbitrability.  *See, e.g.*, *Rent-A-Ctr.,*

14  *W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010) (explaining that unless the parties clearly and

15  unmistakably provide otherwise, the gateway question of whether the parties agreed to arbitrate is

16  to be decided by the court, not the arbitrator); *Litton Fin. Printing Div., Litton Bus. Sys., Inc. v.*

17  *N.L.R.B.*, 501 U.S. 190, 208 (1991) ("Whether or not a company is bound to arbitrate, as well as

18  what issues it must arbitrate, is a matter to be determined by the court . . ."); *First Options of*

19  *Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("If . . . the parties did *not* agree to submit the

20  arbitrability question itself to arbitration, then the court should decide that question just as it would

21  decide any other question that the parties did not submit to arbitration, namely, independently.")

22  (emphasis in original).  Courts, therefore, "apply a more rigorous standard" when determining

23  whether arbitrability is a matter for the arbitrator pursuant to a delegation clause.  *See Momot v.*

24  *Mastro*, 652 F.3d 982, 987 (9th Cir. 2011).  Clear and unmistakable evidence of an agreement to

25  arbitrate arbitrability might include "a course of conduct demonstrating assent" or "an express

26  agreement to do so."  *Id.* at 988 (citation and internal quotation marks omitted).

27          The Ninth Circuit has held that incorporation of the AAA rules constitutes clear and

28  unmistakable evidence that contracting parties agreed to arbitrate arbitrability; it has, however,

United States District Court
Northern District of California

5

1    expressly left open the question of whether this holding applies in the context of unsophisticated

2    parties. *Brennan v. Opus Bank*, 796 F.3d 1125, 1131 (9th Cir. 2015).  Where at least one party is

3    unsophisticated, courts in this district and elsewhere have routinely found that the incorporation of

4    the AAA rules is insufficient to establish a clear and unmistakable agreement to arbitrate

5    arbitrability.  *See, e.g.*, *Magill v. Wells Fargo Bank, N.A.*, No. 4:21-cv-01877-YGR, 2021 WL

6    6199649, at *5 (N.D. Cal. June 25, 2021) (holding that incorporation of the AAA rules does not

7    clearly and unmistakably establish an agreement to delegate questions of arbitrability where one

8    party was unsophisticated); *Ingalls v. Spotify USA, Inc.*, No. 16-cv-03533-WHA, 2016 WL

9    6679561, at *3–4 (N.D. Cal. Nov. 14, 2016) (noting that "every district court decision in our

10   circuit to address the question since *Brennan* has held that incorporation of the AAA rules was

11   insufficient to establish delegability in consumer contracts involving at least one unsophisticated

12   party" and reasoning that unsophisticated parties to an arbitration agreement "could not be

13   expected to appreciate the significance of incorporation of the AAA rules") (collecting cases);

14   *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019) (same and noting that

15   "[f]or an unsophisticated plaintiff to discover she had agreed to delegate gateway questions of

16   arbitrability, she would need to locate the arbitration rules at issue, find and read the relevant rules

17   governing delegation, and then understand the importance of a specific rule granting the arbitrator

18   jurisdiction over questions of validity – a question the Supreme Court itself has deemed 'rather

19   arcane'") (citation omitted); *Money Mailer, LLC v. Brewer*, No. 15-cv-1215, 2016 WL 1393492,

20   at *2 (W.D. Wash. Apr. 8, 2016) (determining that incorporation of AAA rules was not clear and

21   unmistakable delegation where one party was unsophisticated).

22          The Court agrees with this holding.  The Agreement states, "[f]or claims over $10,000, the

23   AAA's consumer arbitration rules will apply."  Agreement (Docket No. 21-1).  AAA Consumer

24   Arbitration Rule 14(a) in turn provides that "[t]he arbitrator shall have the power to rule on his or

25   her own jurisdiction, including any objections with respect to the existence, scope, or to validity of

26   the arbitration agreement or to the arbitrability of any claim or counterclaim."  AAA Consumer

27   Arbitration Rules at R-14(a).  The AAA Rules are not quoted or appended to the Agreement.

28   Common customers of Verizon, including Plaintiffs, should not be expected to understand that the

United States District Court
Northern District of California

United States District Court
Northern District of California

incorporation by reference of the AAA rules—without spelling out the actual provision—would mean that the validity and enforceability of the arbitration provision would be resolved by an arbitrator rather than a court, a result contrary to common expectation.  *Cf. First Options of Chicago*, 514 U.S. at 945 ("[G]iven the principle that a party can be forced to arbitrate only those issues it has specifically agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.").  This is especially true because the Agreement provides that for claims of $10,000 or less, the party bringing the claim can choose either the AAA's consumer arbitration rules or the BBB's rules for binding arbitration.  *See* Agreement at 6.  The BBB rules do *not* contain an explicit delegation clause.  The Court thus finds there is not clear and unmistakable evidence that the parties agreed to arbitrate issues of arbitrability, particularly since it is not clear that the consumer would consider any individual claim to be worth over $10K.

Second, Verizon also argues that several of the provisions that Plaintiffs attack as substantively unconscionable are "fundamentally challenges to the enforceability of the Agreement itself, not the arbitration clause, and are therefore delegated to the arbitrator."  MTC Reply at 2.  Verizon is correct that some of the provisions in question—the 180-day notice period, the pre-dispute jury waiver, the punitive damages waiver, and the purported exculpatory clause—are located outside of the arbitration clause.  *See* Agreement at 4–5, 8.  But this argument "exalts form over substance.  It places a dispositive premium upon the location of the objectionable clause—whether they are written within the arbitration paragraph or the paragraph preceding it—even though the arbitration clause clearly contemplates that all disputes will be resolved through arbitration and that these clauses would apply to arbitration."  *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 726 (N.D. Cal. 2012), *aff'd*, 549 F. App'x 692 (9th Cir. 2013).  All but one of these provisions are functionally intertwined with the arbitration clause and thus were anticipated to affect the scope of arbitration.  The presumption that the Court decides arbitrability (and the terms affecting arbitrability) still obtains, and there is not clear and unmistakable

1    evidence to the contrary.

2          The Court now turns to the question of whether the arbitration provisions are enforceable.

3    D.      Enforceability of the Arbitration Clause

4          Plaintiffs argue that the arbitration agreement is both procedurally and substantively

5    unconscionable and thus unenforceable.  Courts apply state contract law to determine the

6    enforceability of an arbitration agreement.  *Pokorny v. Quixtar*, 601 F.3d 987, 994 (9th Cir. 2010).

7    Under California law, "a contractual provision is unenforceable if it is both procedurally and

8    substantively unconscionable."  *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir.

9    2013) (citing *Armendariz v. Found. Health Psychare Servs., Inc.*, 24 Cal. 4th 83, 89 (2000)).

10   These two prongs operate on a sliding scale: the lesser the procedural unconscionability, the

11   greater substantive unconscionability must be shown, and vice versa.  *Armendariz*, 24 Cal. 4th at

12   89.  "When evaluating procedural unconscionability, courts focus on oppression or surprise that

13   results from unequal bargaining power; while evaluating substantive unconscionability, courts are

14   more concerned with overly harsh or one-sided results."  *Klink v ABC Phones of North Carolina*,

15   No. 20-cv-06276-EMC, 2021 WL 3709167, at *9 (N.D. Cal. Aug. 20, 2021) (citing *Sonic-*

16   *Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145 (2013)).  If the Court determines that any

17   contractual provisions are unconscionable, the Court must then decide whether the unconscionable

18   provisions are severable from the rest of the contract.  *Armendariz*, 24 Cal. 4th at 121–122.

19          1.      Procedural Unconscionability

20          Plaintiffs argue that the agreement is procedurally unconscionable because it is a contract

21   of adhesion.  MTC Opp. at 10.

22          "Procedural unconscionability concerns the manner in which the contract was negotiated

23   and the respective circumstances of the parties at that time, focusing on the level of oppression and

24   surprise involved in the agreement."  *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th

25   Cir. 2013).  "Oppression addresses the weaker party's absence of choice and unequal bargaining

26   power that results in 'no real negotiation.'"  *Id.* (internal quotation omitted).  "Surprise involves

27   the extent to which the contract clearly discloses its terms as well as the reasonable expectations of

28   the weaker party."  *Id.*

United States District Court
Northern District of California

8

1    The arbitration agreement is at least minimally procedurally unconscionable if it is a

2  contract of adhesion.  *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003).  As explained in *Ting*,

3  "[a] contract is procedurally unconscionable if it is a contract of adhesion, *i.e.*, a standardized

4  contract, drafted by the party of superior bargaining strength, that relegates to the subscribing

5  party only the opportunity to adhere to the contract or reject it."  *Id.*  Here, Verizon drafted the

6  Agreement and presented it to Plaintiffs on a "take it or leave it" basis.  *See* Kennedy Decl. ¶¶ 3–4.

7  Plaintiffs did not have an opportunity to negotiate its terms, and each Plaintiff was required to

8  accept the Agreement in order to active his or her wireless service.  *Id.* ¶¶ 3–5.

9    This finding of procedural unconscionability alone is not enough, though, to deny a motion

10 to compel arbitration.  *Klink*, 2021 WL 3709167, at *10; *see also Lane v. Francis Capital Mgmt.*

11 *LLC*, 224 Cal. App. 4th 676, 689 (2014) ("[C]ourts have consistently held that [a contract of

12 adhesion] alone is insufficient to invalidate an arbitration agreement: Rather, an adhesion contract

13 remains fully enforceable unless . . . the provision falls outside the reasonable expectations of the

14 weaker party or it is unconscionable.") (internal quotation omitted); *see also O'Donoghue v.*

15 *Superior Ct.*, 219 Cal. App. 4th 245, 258–59 (2013) (finding that a declaration that "agreements

16 were presented in 'take-it-or-leave-it manner' . . . does not carry the day . . . because the 'adhesive

17 aspect' of a contract 'is not dispositive' on the issue of unconscionability").

18    As in *Lane* and *O'Donoghue*, the agreement here is a contract of adhesion, but the

19 adhesive nature of the agreement presents only a minimal finding of procedural unconscionability.

20    2.    Substantive Unconscionability

21    Since Plaintiffs have only established a minimal amount of procedural unconscionability,

22 they must show significant substantive unfairness to avoid arbitration.  *Ajamian v. CantorCO2e,*

23 *L.P.*, 203 Cal. App. 4th 771, 796 (2012) ("Where . . . the degree of procedural

24 unconscionability . . . is low, [ ] the agreement will be enforceable unless the degree of substantive

25 unconscionability is high.").  Under California law, substantive unconscionability focuses on the

26 terms of the agreement and whether those are "overly harsh" or "one-sided."  *Circuit City Stores,*

27 *Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002); *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064,

28 1071 (2003).

United States District Court
Northern District of California

1    Here, Plaintiffs assert that six provisions of the Agreement are substantively

2    unconscionable: (1) a 180-day contractual statute of limitations; (2) a pre-dispute jury waiver; (3)

3    a punitive damages waiver; (4) a public injunctive relief waiver; (5) an exculpatory clause with

4    unreasonable discovery limits; and (6) a mass arbitration provision.  MTC Opp. at 11.  Plaintiffs

5    maintain that these unconscionable terms so permeate the agreement that they are non-severable

6    and the entire agreement is unenforceable.  *Id.* at 32–24.  Verizon denies that any term is

7    unconscionable, and contends that any terms the Court does deem unconscionable should be

8    severed.  Reply at 9–12.

9    The Court examines each provision in turn.

10    a.    180-Day Contractual Statute of Limitations Provision

11    Plaintiffs first assert that the Agreement is substantively unconscionable because it

12    contains a "180-day contractual statute of limitations for all disputes related to charges on a

13    customer's bill."  MTC Opp. at 11.  Plaintiffs contend that this provision is substantively

14    unconscionable because it "significantly shortens the limitations period on Plaintiffs' CLRA, FAL,

15    and UCL claims, which range from 3 to 4 years."  *Id.*  The provision establishes that:

> If you're a Postpay customer, you can dispute your bill within 180
> days of receiving it . . . You may call us to dispute charges on your
> bill or any service(s) for which you were billed, but if you wish to
> preserve your right to bring an arbitration or small claims case
> regarding such dispute, you must write to us at the customer service
> address on your bill, or send us a completed notice of dispute form
> (available at verizon.com), within the 180-day period mentioned
> above.  If you do not notify us in writing of such dispute within the
> 180-day period, you will have waived your right to dispute the bill
> or such service(s) and to bring an arbitration or small claims case
> regarding any such dispute.

22    Agreement at 4 (capitalization altered for clarity).

23    Verizon counters that the provision is not a statute of limitations because it merely requires

24    customers to provide notice within a 180-day period.  Reply at 5–6.  Because "[p]roviding notice

25    is not the same as commencing a lawsuit," the 180-day notice requirement "is not properly

26    understood as a modification of the statute of limitations."  *Id.*  Verizon also points out that the

27    Agreement separately addresses the applicable statute of limitations: the Agreement provides that

28    "any applicable statute of limitations" are available as defenses in the arbitration.  *Id.* at 6 n.3;

United States District Court
Northern District of California

1    Agreement at 6.  And even if the provision *did* modify the statute of limitations, Verizon contends

2    that would not necessarily be unconscionable.  *Id.* at 6.

3            A provision which requires consumers to *notify* Verizon of a dispute within a set amount of

4    time differs from a statute of limitations.  There is a difference between having to notify a

5    potential defendant of a claim and having to bring a lawsuit.  The former is easier to accomplish.

6    *Cf. Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1076 (9th Cir. 2007) ("The challenged provision

7    covers more than merely 'notice'; it also requires a demand for mediation within a year . . .  the

8    one-year notice provision thus functions as a statute of limitations.").

9            On the other hand, a customer who fails to notify Verizon within the 180-day notice

10   window (because, *e.g.*, they are unaware of this contractual provision which has no precedent in

11   the California Civil Code) will forfeit her right to bring suit.  A short notice period (significantly

12   shorter than the limitations period) sets a trap for the unwary.  Functionally, this provision may

13   well have the same effect as a statute of limitations in limiting the vindication of Plaintiffs' rights.

14   *Cf.* administrative exhaustion requirements that effectively function as a limitations period such as

15   Cal. Gov't Code §§ 911.2 (requiring a person to present his or her claim to the California Victim

16   Compensation and Government Claims Board within six months of the accrual of the cause of

17   action before filing certain actions for damages against a California governmental entity or

18   employee); 945.6(a)(1) (requiring that a claimant must file suit within six months following

19   written notice of rejection of the claim by the Board.

20           "Contractual agreements to shorten the statute of limitations period are generally

21   disfavored because they derogate statutory intent."  *Jackson v. S.A.W. Ent. Ltd.*, 629 F. Supp. 2d

22   1018, 1028 (N.D. Cal. 2009) (internal quotation omitted).  "A contractual clause restricting the

23   period in which an arbitration may be commenced is unconscionable where the period is 'far

24   shorter' than that otherwise available under California law."  *Brown v. Dow Chem. Co.*, No. 18-

25   cv-07098-MMC, 2019 WL 484211, at *4 (N.D. Cal. Feb. 7, 2019) (quoting *Wherry v. Award,*

26   *Inc.*, 192 Cal. App. 4th 1242, 1249 (2011)).  Courts have found that a 180-day statute of

27   limitations is unconscionable where it "significantly shortens" the limitations period for the

28   plaintiff's claims.  *Jackson*, 629 F. Supp. 2d at 1029 (finding six-month statute of limitations

United States District Court
Northern District of California

1    provision substantively unconscionable where plaintiff would otherwise have had three to four

2    years to assert some of her claims); *Martinez v. Master Prot. Corp.*, 118 Cal. App. 4th 107, 114,

3    117–18 (2004) (same).  Here, like in *Jackson* and *Martinez*, the statute of limitations for Plaintiffs'

4    claims ranges from three to four years.  *See* Cal. Civ. Code § 1783 (3 years for CLRA), Cal. Civ.

5    Proc. Code § 338(a) (3 years for FAL), Cal. Bus. & Prof. Code § 17208 (4 years for UCL).

6         Although not quite as draconian as a limitation clause, the short notice provision here

7    erects a potential trap to the unwary that may have the same effect as a short limitations period.

8    The Court concludes that there is at least some degree of substantive unconscionability associated

9    with the 180-day notice provision.

10                    b.    Pre-Dispute Jury Trial Waiver Provision

11        Second, Plaintiffs argue that the pre-dispute jury trial waiver provision is substantively

12   unconscionable.  MTC Opp. at 13.  The provision establishes that:

13              If for any reason a claim proceeds in court rather than through
             arbitration, you and Verizon agree that there will not be a jury trial.
14           You and Verizon unconditionally waive any right to trial by jury in
             any action, proceeding or counterclaim arising out of or relating to
15           this agreement in any way.

16   Agreement at 8 (capitalization altered for clarity).

17        "Under California law, pre-dispute jury trial waivers are invalid unless expressly

18   authorized by statute."  *In re County of Orange*, 784 F.3d 520, 523 (9th Cir. 2015) (citing *Grafton*

19   *Partners, L.P. v. Superior Ct.*, 36 Cal. 4th 944 (2005)).  Courts have held that an arbitration

20   agreement is unenforceable where it "require[s] plaintiffs to waive in advance their right to a jury

21   trial for any dispute for which arbitration is not allowed by law."  *Dougherty v. Roseville Heritage*

22   *Partners*, 47 Cal. App. 5th 93, 107 (2020); *see also Lange v. Monster Energy Co.*, 46 Cal. App.

23   5th 436, 452 (2020) (finding that pre-dispute jury trial waiver provision in arbitration agreement

24   was substantively unconscionable); *Durruthy v. Charter Commc'ns, LLC*, No. 20-cv-1374, 2020

25   WL 6871048, at *12 (S.D. Cal. Nov. 23, 2020) (same).

26        Verizon cites *Grafton* for the principle that pre-dispute arbitration agreements are

27   "specifically authorized by statute" and thus distinguishable from waivers of the right to jury trial.

28   *Grafton*, 36 Cal. 4th at 955.  But that is not the issue here.  While a jury trial waiver is inherent in

arbitration agreements, Plaintiffs take issue with the jury trial waiver preceded by the words "if for any reason a claim proceeds in court rather than through arbitration."  *That* jury trial waiver "is not susceptible to any interpretation *other* than as an unconscionable predispute jury trial waiver." *Lange*, 46 Cal. App. 5th at 452 (emphasis in original) (citing *Grafton*, 36 Cal. 4th at 961).

While the Court concludes that the pre-dispute jury trial waiver is unenforceable and substantively unconscionable, this provision only applies to claims that proceed outside of arbitration.  *See* Agreement at 8 ("If for any reason a claim proceeds in court rather than through arbitration, you and Verizon agree that there will not be a jury trial.").  In other words, by its express terms, the provision is triggered when a claim is *not* being arbitrated.  *Id.*  Thus, because the jury trial waiver does not "limit the scope of the arbitration," the Court puts no weight on this provision in assessing the substantive unconscionability of the arbitration clause.  *Newton*, 854 F. Supp. 2d at 726.

### c.   Punitive Damages Waiver Provision

Third, Plaintiffs argue that the punitive damages waiver is substantively unconscionable because it prohibits punitive damages, which are available under the CLRA.  MTC Opp. at 13–14; Cal. Civ. Code § 1780(a)(4).  Plaintiffs have not actually sought punitive damages in the FAC but seek leave to do so.[1]  The relevant provision establishes that:

> You and Verizon both agree to limit claims against each other solely to direct damages.  That means neither of us will claim any damages that are indirect, special, consequential, incidental, treble or punitive.

Agreement at 5.  Verizon does not address Plaintiffs' arguments regarding this provision.

California courts have found substantive unconscionability where an arbitration clause limits the types of remedies that would be available under the statute, thus violating the "principle that an arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees."  *Newton*, 854 F. Supp. 2d at 724 (quoting *Armendariz*, 24 Cal. 4th at 103); *see*

---

[1] Plaintiffs explained that they inadvertently omitted a specific prayer for punitive damages in the First Amended Complaint.  They request leave to amend solely to add the prayer for punitive damages.  *See* MTC Opp. at 14 n.15.

13

United States District Court
Northern District of California

1    *also Zaborowski v. MHN Gov't Servs., Inc.*, 936 F. Supp. 2d 1145, 1155 (N.D. Cal. 2013), *aff'd*,

2    601 F. App'x 461, 463 (9th Cir. 2014) ("California courts have repeatedly refused to enforce

3    contractual limitations on statutorily imposed remedies such as punitive damages as

4    unconscionable, based primarily on the rationale that the remedies are important to the

5    effectuation of that statute's policy.") (internal quotation omitted).  Because the limitation of

6    liability clause prevents Plaintiffs from receiving damages that they are entitled to under CLRA,

7    this term is substantively unconscionable.  *Newton*, 854 F. Supp. 2d at 725; *Dougherty*, 47 Cal.

8    App. 5th at 107.  As noted above, although this limitation is located outside the arbitration clause,

9    it is intertwined with and enforced via arbitration.

10      The Court concludes that this provision is substantively unconscionable.

11           d.      Public Injunctive Relief Waiver Provision

12      Fourth, Plaintiffs argue that the public injunctive relief waiver provision is substantively

13    unconscionable.  MTC Opp. at 14–15.  The provision establishes that:

14

15           Notwithstanding any other provision of this agreement, the arbitrator may award money or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

16

17    Agreement at 6 (capitalization altered for clarity).

18      Under California law, a contractual provision purporting to waive the right to seek public

19    injunctive relief in any forum is unenforceable.  *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 952

20    (2017).  Verizon's agreement limits the award of any injunctive relief to "the individual party

21    seeking relief and only to the extent necessary to provide relief warranted by that party's

22    individual claim."  Agreement at 6.  By precluding injunctive relief benefitting anyone other than

23    the individual claimant, the contract prevents Plaintiffs from seeking public injunctive relief in any

24    forum, a right which cannot be denied whether in arbitration or otherwise.  Therefore, if Plaintiffs'

25    requested relief qualifies as public injunctive relief, Verizon may not negate that claim.  *McGill*, 2

26    Cal. 5th at 952.

27      Verizon contends that Plaintiffs are not seeking "true public relief" within the meaning of

28    *McGill*.  Reply at 8–9.  Verizon is mistaken.  "[T]o qualify as public injunctive relief, an

14

injunction must be 'for the benefit of the general public as a whole, as opposed to a particular class of persons.'" *Cottrell v. AT&T Inc.*, No. 20-cv-16162, 2021 WL 4963246 (9th Cir. Oct. 26, 2021) (quoting *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021)). "[T]he statutory schemes set out in 'the UCL, the CLRA, and the false advertising law' are explicitly designed to provide for 'public injunctive relief' that is '[b]y definition' 'primarily for the benefit of the general public.'" *Vasquez v. Cebridge Telecom CA, LLC*, No. 21-cv-06400-EMC, 2021 WL 5113217, at *7 (N.D. Cal. Nov. 3, 2021) (quoting *McGill*, 2 Cal. 5th at 961). Indeed, in *Hodges*, the Ninth Circuit observed that "[t]he paradigmatic example [of public injunctive relief] would be the sort of injunctive relief sought in *McGill* itself, where the plaintiff sought an injunction against the use of false advertising to promote a credit protection plan." 12 F.4th at 542.

Here, the FAC seeks this "paradigmatic example" of public injunctive relief: to enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public via public injunctions under the UCL, FAL, and CLRA—the very same statutes and type of relief at issue in *McGill*. *See, e.g.*, FAC ¶ 12 ("Plaintiffs, by this action, seek a public injunction for the benefit of the general public to . . . enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public"); ¶ 14 ("Plaintiffs want Verizon to include the amount of the Administrative Charge in the wireless service plan prices it advertises to the general public"); ¶ 512 ("Each Plaintiff brings this claim in his or her individual capacity, in his or her capacity as a private attorney general seeking the imposition of public injunctive relief to protect the general public"); Prayer § A(1)–(3) ("In order to prevent injury to the general public, Plaintiffs individually, and as private attorneys general, request that the Court enter a public injunction against Verizon under the CLRA, FAL, and UCL . . . [to] [p]ermanently enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public"). Verizon is thus incorrect that Plaintiffs' "claims and requested remedy only pertain to the limited universe of customers who have specific contracts with Verizon." MTC at 10.

Verizon also complains that Plaintiffs have "only conclusorily allege[d] their right to such a remedy." MTC at 10. In *McGill* itself, however, the California Supreme Court found sufficient

allegations of false advertising less detailed than those here—for example, that the defendant "'continue[s] to violate' the UCL by selling the Plan 'with advertising that includes false, misleading or deceptive information.'"

During the hearing, Verizon argued that the Supreme Court's impending decision in *Viking River Cruises, Inc. v. Moriana* may implicate and undermine *McGill*. After the decision was handed down, the Court allowed the parties to submit supplemental briefing to address the applicability of *Viking River*. Docket Nos. 50–52. After carefully considering the parties' arguments, the Court agrees with Plaintiffs that *Viking River* does not undermine *McGill* or otherwise bear on the present case. *Viking River* focused on a procedural mechanism particular to California's Labor Code Private Attorneys General Act of 2004 ("PAGA"), which allows any "aggrieved employee" to initiate an action against a former employer to obtain civil penalties that previously could have been recovered only by the State. *Viking River*, No. 20-1573, Slip Op. at 2 (quoting Cal. Lab. Code Ann. § 2699(a)). *Viking River* held that the FAA preempts a rule of California law that PAGA claims could not be split into arbitrable "individual" claims, which are based on a violation personally experienced by the plaintiff, and nonarbitrable "representative" claims, which are brought on behalf of violations experienced by other employees. *Id.* at 20. Importantly, *Viking River* found that the FAA does *not* preempt a rule of California law prohibiting wholesale waivers of the right to assert representative claims under PAGA. *Id.* at 21. Thus nothing in *Viking River* overrules or undermines *McGill*'s core holding that an arbitration agreement cannot prohibit a party from seeking public injunctive relief in any forum.

Under *McGill*, this provision of the arbitration agreement is unenforceable.

### e.   Exculpatory Clause and Its Discovery Limitations Provision

Fifth, Plaintiffs argue that the purported "exculpatory clause" and "its discovery limitation" are substantively unconscionable. MTC Opp. at 16–17. The provision provides that:

> This agreement and the documents it incorporates form the entire agreement between us. You can't rely on any other documents, or on what's said by any Sales or Customer Service Representatives, and you have no other rights regarding Service or this agreement.

Agreement at 8.

16

United States District Court
Northern District of California

1    The parties have very different understandings of the meaning of this provision.  From

2  Plaintiffs' perspective, the provision "purports to exculpate Verizon from the misleading

3  misrepresentations made in its advertisements or by its sales and customer service

4  representatives."  MTC Opp. at 16.  *Any* reliance on such evidence would be barred.  Plaintiffs

5  further argue that the provision "unconscionably limits a consumer's right to adequate discovery

6  in arbitration by commanding that a consumer 'cannot rely' upon (and therefore cannot discover)

7  the very documents and statements that formed the basis of the false advertising or fraud."  *Id.*

8  Verizon, on the other hand, characterizes this provision as a "routine integration clause."  Reply at

9  8.

10    The problem with Verizon's theory is that this provision appears to sweep broader than a

11  common integration clause—it purports to exclude *all* extrinsic evidence without *any* exceptions,

12  even to claims for which extrinsic or parol evidence may be considered.  For instance, "[e]vidence

13  extrinsic to the contract is always permissible to prove fraud in the inducement of the contract

14  pursuant to both common and statutory law."  *625 3rd St. Assocs., L.P. v. Alliant Credit Union*,

15  633 F. Supp. 2d 1040, 1051 (N.D. Cal. 2009); *see also In re Lund*, 357 F. App'x 139, 141 (9th Cir.

16  2009) (noting that "the parol evidence rule does not bar introduction of extrinsic evidence to show

17  fraudulent inducement"); *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55

18  Cal. 4th 1169, 1180–81 (2013) ("[I]t was never intended that the parol evidence rule should be

19  used as a shield to prevent the proof of fraud.") (quoting *Ferguson v. Koch*, 204 Cal. 342, 345

20  (1928)).  The exculpatory claims here thus may function to negate substantive legal rights and

21  remedies of Verizon consumers.

22    Verizon contends that Plaintiffs' arguments are not applicable because "Plaintiffs have not

23  even asserted a fraud claim."  Reply at 8.  But Plaintiffs have alleged that Verizon has violated the

24  UCL by engaging in "unfair and fraudulent business acts and practices," including by, among

25  other things, "[m]isrepresenting the prices of Verizon's wireless service plans and concealing the

26  true prices of its wireless service plans," "[m]isrepresenting the prices of Verizon's wireless

27  service plans by advertising or quoting prices that do not include the monthly Administrative

28  Charge," and "[f]ailing to disclose the existence or amount of the Administrative Charge when

17

1   consumers sign up for Verizon's wireless service plans." FAC ¶¶ 554(a)–(c). These allegations

2   may imply fraud in the inducement.

3       The Court concludes that because the provision does not allow for extrinsic evidence to be

4   considered under any circumstances, including to show fraud, this provision is substantively

5   unconscionable.

6               f.      Mass Arbitration Provision

7       Finally, Plaintiffs argue that the mass arbitration provision is substantively unconscionable.

8   MTC Opp. at 17–23. The provision establishes that:

9               If 25 or more customers initiate notices of dispute with Verizon
                Wireless raising similar claims, and counsel for the Verizon
10              Wireless customers bringing the claims are the same or coordinated
                for these customers, the claims shall proceed in arbitration in a
11              coordinated proceeding. Counsel for the Verizon Wireless
                customers and counsel for Verizon Wireless shall each select five
12              cases to proceed first in arbitration in a bellwether proceeding. The
                remaining cases shall not be filed in arbitration until the first ten
13              have been resolved. If the parties are unable to resolve the
                remaining cases after the conclusion of the bellwether proceeding,
14              each side may select another five cases to proceed to arbitration for a
                second bellwether proceeding. This process may continue until the
15              parties are able to resolve all of the claims, either through settlement
                or arbitration. A court will have authority to enforce this clause and,
16              if necessary, to enjoin the mass filing of arbitration demands against
                Verizon.
17

18   Agreement at 7 (capitalization altered for clarity).

19       In other words, the mass arbitration provision, which is triggered when 25 or more

20   customers who are represented by the same counsel raise "similar claims," sets a cap on the

21   number of arbitrations against Verizon that may proceed at one time. *Id.* It also functions to delay

22   arbitration of cases until each preceding tranche of 10 cases is adjudicated. Counsel for plaintiffs

23   and counsel for Verizon each select five cases; all remaining cases "shall not be filed in

24   arbitration" until the first ten have been resolved. *Id.* Once the first ten have been resolved, then

25   the additional cases with "similar claims" and the same plaintiffs' counsel are arbitrated in batches

26   of ten. *Id.* Plaintiffs' counsel currently represent 2,712 Verizon customers. *See* Docket No. 30

27   (Declaration of Daniel M. Hattis, or "Hattis Decl.") ¶ 3. The provision specifically requires that

28   only ten cases may be arbitrated at one time and that the remaining cases "*shall not* be filed in

United States District Court
Northern District of California

18

arbitration until the first ten have been resolved."  Agreement at 7 (emphasis added).  According to statistics from the American Arbitration Association showing that the average disposition time for an arbitration takes a little under seven months, Plaintiffs calculate that it would take approximately 156 years to resolve the claims of all of Plaintiffs' counsel's clients.  MTC Opp. at 17–18 & 18 n.17.

Plaintiffs argue that this provision "contains all of the hallmarks of unconscionability: it is overly harsh, unduly oppressive, and unfairly one-sided; it lacks mutuality; it would deter potential litigants from enforcing their rights, it contravenes public policy, and it interferes with consumers' constitutional right to their choice of counsel."  *Id*. at 17.  Verizon characterizes Plaintiffs' arguments as "speculative distractions."  Reply at 12.  According to Verizon, the "27 Plaintiffs in the instant case could have their claims resolved in three concurrent proceedings—a far cry from the 156 years speculated by Plaintiffs."  *Id.* at 13.  Verizon maintains that its "coordinated proceeding approach" is "designed precisely to expedite resolution of similar cases."  *Id.*

Verizon also insists that the unconscionability analysis must be limited to the twenty-seven Plaintiffs in this case without regard to the other 2,685 customers of Verizon that are clients of Plaintiffs' law firm.  *See* Reply at 1 ("Plaintiffs further ask this Court to look beyond their suit and to consider thousands of unnamed Verizon Wireless customers purportedly also retained by Plaintiffs' counsel but who have yet to file any action in this Court or elsewhere.").  According to Verizon, "[t]heoretical issues facing individuals not before this Court cannot serve as the basis for an unconscionability challenge."  *Id.*; *see also id.* at 13 ("Plaintiffs [*sic*] arguments rely almost entirely on delay that would theoretically be experienced by 2,712[2] individuals who are not before this Court.").  On this point, Verizon is wrong.  In assessing unconscionability, the Court must examine the validity of a contractual provision as of the time of the contract is made – it is a prospective analysis which does not require proof that a particular plaintiff has already been

---

[2] For clarity, the Court notes that according to the Hattis Declaration, Hattis & Lukacs have been retained by 2,712 separate clients from around the country who each have false advertising claims against Verizon that are similar to the claims alleged in the present suit.  Hattis Decl. ¶ 3.  Twenty-seven of these clients are the Plaintiffs in this action.  *Id.*  There are thus 2,685 customers of Verizon who are not currently Plaintiffs before the Court.

United States District Court
Northern District of California

1    adversely affected.  *See, e.g.*, *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 875 (9th

2    Cir. 1979) ("[W]hether a contract is fair or works an unconscionable hardship is determined with

3    reference to the time when the contract was made and cannot be resolved by hindsight.");

4    *Yerkovich v. MCA, Inc.*, 11 F. Supp. 2d 1167, 1173 (C.D. Cal. 1997), *aff'd*, 211 F.3d 1276 (9th

5    Cir. 2000) ("An unconscionability claim accrues at the moment when the allegedly

6    unconscionable contract is formed . . . [the] unconscionability of a contract or a contract clause is

7    determined based on the law and facts at the time of the agreement.").

8         Moreover, the California Supreme Court in *Armendariz* considered the potential chilling

9    effect that an arbitration clause would exert on employees seeking to file workplace discrimination

10   claims.  *See Armendariz*, 24 Cal. 4th at 110 ("Such a system still poses a significant risk that

11   employees will have to bear large costs to vindicate their statutory right against workplace

12   discrimination, and therefore chills the exercise of that right.").  In the wake of *Armendariz*, courts

13   routinely consider the chilling effect on non-parties who may yet seek to vindicate their rights.

14   *See, e.g.*, *Pereyra v. Guaranteed Rate, Inc.*, No. 18-cv-06669-EMC, 2019 WL 2716519, at *8

15   (N.D. Cal. June 28, 2019) (finding substantive unconscionability where "[t]he existence of the fee

16   provision may well have a chilling effect on employees seeking to vindicate their rights");

17   *Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1188 (N.D. Cal. 2020)

18   ("This provision undermines the balance of the risk of fee shifting prescribed by statute and can

19   have a substantial chilling effect on plaintiffs seeking to vindicate their rights.  This provision is

20   substantively unconscionable."); *Martinez*, 118 Cal. App. 4th at 118 (rejecting provision because

21   "[t]he mere inclusion of the costs provision in the arbitration agreement produces an unacceptable

22   chilling effect"); *cf. Capili v. Finish Line, Inc.*, 116 F. Supp. 3d 1000, 1009 (N.D. Cal. 2015),

23   *aff'd*, 699 F. App'x 620 (9th Cir. 2017) (rejecting company's offer to waive unconscionable

24   provisions in arbitration agreement and noting that "the mere inclusion of these unconscionable

25   provisions has an improper chilling effect").  Taken collectively, these cases indicate that courts

26   may consider the chilling effect of an arbitration clause on individuals to whom it would apply but

27   are not currently plaintiffs.  As a result, the Court will consider the unconscionability of the mass

28   arbitration provision with regard to both the twenty-seven Plaintiffs and the 2,685 other

individuals who are represented by Plaintiffs' firm.

The Court agrees with Plaintiffs that this provision is substantively unconscionable.

Requiring the consumers who retain counsel willing to represent them in cases such as this to wait months, more likely years before they can even submit a demand for arbitration is "unreasonably favorable" to Verizon. *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017). Delaying the ability of one to vindicate a legal claim by years, possibly *156 years*, "conflict[s] with one of the basic principles of our legal system—justice delayed is justice denied." *Dietrich v. Boeing Co.*, 14 F.4th 1089, 1095 (9th Cir. 2021). Terms that "contravene the public interest or public policy" are substantively unconscionable. *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244 (2016).

In addition to the length of delay, the provision is pregnant with the risk that claims will be effectively barred when coupled with the statute of limitations. The Agreement expressly reserves Verizon's right to raise a statute of limitations defense in arbitration. *See* Opp. at 18; Agreement at 6 ("The same defenses are also available to both parties as would be available in court, including any applicable statute of limitations."). Under the Mass Arbitration Provision, consumers may not "file" their claims in arbitration until all preceding traunches are adjudicated. Those in the queue who are not able to file within the limitations period would be forever barred. The clause contains no tolling provision. The forfeiture of entire legal rights contravenes public policy. *See Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009) (noting that "California public policy is violated by forcing such plaintiffs to waive their rights to a class action and remedies under California consumer law"); *Kooiman v. Siwell, Inc.*, No. 20-cv-00565, 2021 WL 899095, at *5 (C.D. Cal. Jan. 4, 2021) (refusing to enforce a forum selection clause which "violates public policy by "allowing unwaivable rights to be diminished").

After the hearing, Verizon sought leave to notify the Court of upcoming changes to the Agreement. *See* Docket No. 43, Docket No. 44. According to these filings, Verizon plans to update the Agreement "in or around August 2022" to "expressly provide that, upon initiating a notice of dispute or filing a complaint in court, the statutes of limitations applicable to a customer's dispute are tolled until the completion of the coordinated arbitration proceeding

described in Paragraph (6)."  Docket No. 44 at 2.  In response, Plaintiffs pointed out that the Agreement precludes Verizon from changing the terms of dispute resolution proceedings once a dispute is pending.  *See* Docket 46 at 3.  Plaintiffs are correct: the Agreement specifically provides that "if [Verizon] make[s] any changes to the dispute resolution provision of this Agreement, such changes will not affect the resolution of any disputes that arose before such change."  Agreement at 2.  As a result, Verizon's efforts to cure the statute of limitations problem for the Plaintiffs herein are unavailing.  And in any event, the contemplated changes are not in effect.

The provision also lacks mutuality, which is a "paramount" consideration in assessing substantive unconscionability.  *Pokorny*, 601 F.3d at 997 (internal quotation omitted).  Although the provision imposes restrictions on a law firm representing twenty-five or more of Verizon's customers with "similar claims," Verizon is apparently free to select the same law firm to represent it in all of its arbitrations.  *See* Agreement at 6.  Verizon is thus able to enjoy all of the advantages that come from being a "repeat player," while law firms that represent twenty-five or more of Verizon's customers may be forced to sideline any clients which would exceed the numeric cap.

This case stands in stark contrast to *McGrath v. DoorDash*, where this Court examined the validity of a mass arbitration provision modeled off of the Employment-Related Mass Claims Protocol of the International Institute for Conflict Prevention & Resolution.[3]  *McGrath v. DoorDash, Inc.*, No. 19-cv-05279-EMC, 2020 WL 6526129, at *4 (N.D. Cal. Nov. 5, 2020).  Like with the present provision, DoorDash's "Mass-Claims Protocol" applied any time more than a certain number of individual employment-related arbitration claims "of a nearly identical nature" were filed against DoorDash in "close proximity" to one another.  *Id.*  But the similarities ended there.  Under the Protocol, claims were randomly assigned numbers.  *Id.*  The Protocol provided that the claims numbered 1-10 would, in general, be the "initial Test Cases" to proceed to arbitration.  *Id.*  Importantly, the Protocol generally required that "these claims will be resolved within 120 days of the initial pre-hearing conference."  *Id.*  "Thereafter, the results of the initial

---

[3] The International Institute for Conflict Prevention & Resolution, or CPR, is a 501(c)(3) not-for-profit organization formed in 1977.  *McGrath*, 2020 WL 6526129, at *4 n.5.

1    cases are given to a mediator who will try to resolve the remaining cases.  After a mediation

2    period of 90 days, the parties may choose to opt out of the arbitration process and proceed in court

3    with the remaining claims."  *Id.* (internal quotation omitted).

4           Because the DoorDash arbitration agreement contained a delegation clause, the Court's

5    role was limited to evaluating whether the Protocol was "so biased that it negates the agreement to

6    arbitrate."  *Id.* at *11.  In explaining why the terms of the Mass-Claims Protocol "appear fair," the

7    Court noted that there was "little concrete evidence to support Plaintiffs' argument that the Mass-

8    Claims Protocol would result in significant delay in resolution of the Dashers' claims."  *Id.* at *10.

9    And the Court observed that "[m]ost important, after the mediation process, a claimant can choose

10   to opt out of the arbitration process and go back to court – an option not generally available under,

11   *e.g.*, AAA rules."  *Id.* at *10.  In short, the DoorDash Mass-Claims Protocol did not create the

12   possibility of significant delay that is facially present here.

13          This provision at issue herein also stands in stark contrast to the American Arbitration

14   Association's ("AAA") Supplementary Rules for Multiple Case Filings, which the AAA

15   developed last year to "provide parties and their representatives with an efficient and economical

16   path toward the resolution of multiple individual disputes."  *See* Am. Arbitration Ass'n,

17   *Supplementary Rules for Multiple Case Filings* 3 (Aug. 1, 2021).  The Supplementary Rules apply

18   where 25 or more similar demands for arbitration are filed against or on behalf of the same party

19   or related parties, and where representation of the parties is consistent or coordinated across the

20   cases.  *Id.* at 4.  The Supplementary Rules *do not* require that a party wait a set amount of time

21   before initiating a demand for arbitration.  Nor do they require that arbitrations proceed in

22   tranches.  And while the Supplementary Rules provide that the parties shall participate in a global

23   mediation within a set amount of time, "any party may unilaterally opt out of mediation upon

24   written notification to the AAA and the other parties to the arbitration."  *Id.* at 8–9.  The Rules

25   also make clear that the global mediation shall take place currently with the arbitrations and "shall

26   not act as a stay of the arbitration proceedings."  *Id.* at 8.  Verizon's mass arbitration provision

27   thus has little in common with the Supplementary Rules.  It is one thing to set up a bellwether

28   system to adjudicate a group of cases with the purpose of facilitating global or widespread

United States District Court
Northern District of California

23

1    resolution via ADR.  It is another to formally bar the timely adjudication of cases that do not

2    settle.

3            For all of the foregoing reasons, the Court concludes that the provision is substantively

4    unconscionable.

5            3.    Severability

6            Because the Court finds that both procedural and substantive unconscionability are present,

7    the Court must analyze whether the unconscionable parts of the arbitration provision should be

8    severed or whether it should refuse to enforce the arbitration agreement altogether because

9    unconscionability permeates the entire agreement.

10           "If the court as a matter of law finds the contract or any clause of the contract to have been

11   unconscionable at the time it was made the court may refuse to enforce the contract, or it may

12   enforce the remainder of the contract without the unconscionable clause, or it may so limit the

13   application of any unconscionable clause as to avoid any unconscionable result."  Cal. Civ. Code §

14   1670.5(a).  The Court has the discretion to sever or limit unconscionable clauses.  *See id.*; *see also*

15   *Poublon*, 846 F.3d at 1272.

16           In making this decision, the Court will look to the purpose of the contract.  "If the central

17   purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced.

18   If the illegality is collateral to the main purpose of the contract, and the illegal provision can be

19   extirpated from the contract by means of severance or restriction, then such severance and

20   restriction are appropriate."  *Armendariz*, 24 Cal. 4th at 124.  In particular, when an arbitration

21   clause is "permeated" by unconscionability, severance is not required.  *Id.*

22           The California Supreme Court in *Armendariz* weighed three factors in determining

23   whether severance is appropriate: (1) whether the substantively unconscionable provision relates

24   to the arbitration agreement's chief objective; (2) whether the arbitration agreement contained

25   multiple substantively unconscionable provisions such that it indicates a systematic effort to

26   impose arbitration not simply as an alternative to litigation, but as an inferior forum; and (3) a lack

27   of mutuality that permeated the entire agreement.  24 Cal. 4th at 124–25, *see also Poublon*, 846

28   F.3d at 1272 (severance is determined by examining the unconscionable provisions in relation to

24

1   the purpose of the contract).

2   　　　　　　　　　a.　　Severability Clauses in the Agreement

3   　　　　The Agreement has two provisions which bear on severability.  First, the arbitration clause

4   has a severability provision, which reads:

5   　　　　　　If for some reason the prohibition on class arbitrations set forth in
　　　　　　subsection (3) cannot be enforced as to all or part of a dispute, then
6   　　　　　　the agreement to arbitrate will not apply to that dispute or part of the
　　　　　　dispute.
7

8   Agreement at 7 (capitalization altered for clarity).  Subsection three, in turn, precludes claims for

9   class, representative or private attorney general, or general injunctive relief.  *Id.* at 6.  The

10   Agreement also has a second severability provision, which reads:

11   　　　　　　If any part of this agreement, including anything regarding the
　　　　　　arbitration process (except for the prohibition on class arbitrations as
12   　　　　　　explained in part 8 of the dispute resolution section above), is ruled
　　　　　　invalid, that part may be removed from this agreement.
13

14   Agreement at 8.

15   　　　　"Severability clauses evidence the parties' intent that, to the extent possible, the valid

16   provisions of the contracts be given effect, even if some provision is found to be invalid or

17   unlawful."  *Pereyra*, 2019 WL 2716519, at *10 (quoting *Baeza v. Superior Ct.*, 201 Cal. App. 4th

18   1214 (2011)).

19   　　　　However, as explained below, the severance clauses are not dispositive in this case.

20   　　　　　　　　　b.　　Severance Is Not Appropriate Because the Agreement Is Permeated by

21   　　　　　　　　　　　　Unconscionability

22   　　　　The existence of the severability clauses does not change the fact that where an agreement

23   is permeated by unconscionability, a court will not sever the unlawful provisions.  *See Jackson*,

24   629 F. Supp. 2d at 1030 (refusing to apply severability clause to save an agreement permeated by

25   unconscionability); *Serafin v. Balco Properties Ltd., LLC*, 235 Cal. App. 4th 165, 183–84 (2015)

26   ("[A] court should sever an unconscionable provision unless the agreement is so 'permeated' by

27   unconscionability that it cannot be cured by severance.").  As a result, the critical question for the

28   Court is whether the Agreement is so permeated by unconscionability that it warrants departing

United States District Court
Northern District of California

1    from the generalized severance clause, which instructs that should "any part" of the Agreement be

2    "ruled invalid," then "that part may be removed" from the Agreement.  Agreement at 8.

3            Verizon is correct that, as a mechanical matter, the problematic provisions could be

4    excised from the Agreement, leaving enough of the arbitration and arbitration-related provisions

5    for the Court to enforce and without requiring the Court to reform the agreement.  *See Armendariz*,

6    24 Cal. 4th at 124.  "But the fact that a severance can mechanically and grammatically be

7    accomplished is not dispositive."  *Jackson*, 629 F. Supp. 2d at 1030.  As noted above, the

8    California Supreme Court in *Armendariz* was also concerned with whether there was something in

9    the arbitration agreement—such as the fact of more than one unlawful provision—which

10   suggested that the party in the superior bargaining position was trying to impose arbitration not as

11   an alternative to litigation but rather as an inferior forum.

12           Here, there is strong evidence that Verizon was trying to impose an "inferior forum" on its

13   customers.  First, the notice period creates a narrow six-month window in which Verizon's

14   customers must notify Verizon of the dispute or otherwise waive their claims.  Though different

15   from a statute of limitations, as explained above, it may have the same operative effect as a

16   practical matter.  Second, the limitations of liability provision prevents Plaintiffs from recovering

17   any punitive damages, therefore negating a statutory right to a remedy.  Third, the public

18   injunctive relief waiver prevents Plaintiffs from raising important claims currently protected by

19   statute.  Fourth, the exculpatory provision prevents Plaintiffs from relying on information

20   provided to them by, *e.g.*, Verizon's customer service representatives even for claims such as

21   fraud in the inducement for which an exception to the parol evidence rule has long existed.

22   Finally, the mass arbitration provision means that many of Verizon customers will not be able to

23   file a claim in arbitration for years and possibly ever.  It can operate to effectively thwart

24   arbitration and vindication of rights altogether.  In sum, the arbitration clause and the applicable

25   limitations as a whole demonstrate a systematic effort to impose arbitration on a customer as an

26   inferior forum.  *Newton*, 854 F. Supp. 2d at 729.  The Court reaches this conclusion based on the

27   number of unconscionable provisions, their nature, and the overall effect which is entirely

28   foreseeable and intended.  It appears to the Court that the object of the Agreement is to force

Verizon consumers into an inferior (and, in many circumstances, wholly ineffective) forum.

The Court further notes that permitting the Agreement to stand because Verizon proposes to sever any unconscionable provisions creates a "perverse incentive." *See Capili*, 116 F. Supp. 3d at 1009. If the Court were to sever the numerous unconscionable provisions in a case such as this, companies could be incentivized to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event that they are challenged successfully in court. *Id.*; *cf. Kooiman v. Siwell, Inc.*, No. 20-cv-00565, 2021 WL 899095, at *5 (C.D. Cal. Jan. 4, 2021) ("Unfortunately, the drafters of such unenforceable provisions are often rewarded because of the chilling effect they have; a California employee is likely to believe the contractual provision to be binding and may therefore simply forego pursuit of her statutory rights . . ."); *Armendariz*, 24 Cal. 4th at 110 ("Such a system still poses a significant risk that employees will have to bear large costs to vindicate their statutory right against workplace discrimination, and therefore chills the exercise of that right."). The remedy of severance, therefore, may indirectly reward systemic unconscionability. The remedy of severance deserves close consideration and scrutiny.

The Court concludes that severance of the unconscionable provisions is not appropriate and, therefore, **DENIES** Verizon's motion to compel arbitration. Verizon's request to stay proceedings is **DENIED** as moot.

## V.     CONCLUSION

For the foregoing reasons, the Court **DENIES** Verizon's motion to compel arbitration. Verizon's request for leave to file notification of change to the Customer Agreement is **DENIED** as moot.

This order disposes of Docket Nos. 20 and 43.

**IT IS SO ORDERED**.


Dated: July 1, 2022

_____
EDWARD M. CHEN
United States District Judge

27