Daniel M. Hattis (SBN 232141)
Paul Karl Lukacs (SBN 197007)
HATTIS & LUKACS
400 108th Ave NE, Ste 500
Bellevue, WA 98004
Telephone: (425) 233-8650
Emails: dan@hattislaw.com, pkl@hattislaw.com

Stephen P. DeNittis, Esq. (admitted *pro hac vice*)
DENITTIS OSEFCHEN PRINCE, P.C.
5 Greentree Centre, Suite 410
525 Route 73 N.
Marlton, New Jersey 08057
Telephone: (856) 797-9951
Email: sdenittis@denittislaw.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA MACCLELLAND; KAREN UMBERGER; SCOTT WILLITS; MICHAEL BRANOM; MOLLY BROWN; MICHAEL CARNEY; TIM FRASCH; PATRICIA GAGAN; ANNA GUTIERREZ; LINDA JENKINS; AUGUSTUS JOHNSON; WILLIAM KAUPELIS; MARILYN KAYE; JANETTE LISNER; WILLIAM ERIC LOUGH; DAVID MASSARO; LOUISE MONSOUR; DARLEEN PEREZ; GABRIELLE POZZUOLI; VALERIE REED; BRUCE SCHRAMM; KERRY SHOWALTER; JOHN ST.JARRE; GLORIA STERN; EDNA TOY; TERESA TOY; and VANESSA WEST; For Themselves, As Private Attorneys General, and On Behalf Of All Others Similarly Situated, | Case No. 3:21-cv-08592-EMC <br><br> **CLASS ACTION** <br><br> **SECOND AMENDED COMPLAINT FOR:** <br><br> **(1) VIOLATION OF CAL. CIVIL CODE § 1750;** <br><br> **(2) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17500;** <br><br> **(3) VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE § 17200** <br><br> **(4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS; and VERIZON COMMUNICATIONS INC., | |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION.................................................................................- 1 -

II.    THE PARTIES .................................................................................- 4 -

III.   JURISDICTION AND VENUE ....................................................- 5 -

IV.    FACTUAL ALLEGATIONS OF VERIZON'S ADMINISTRATIVE
       CHARGE SCHEME .........................................................................- 6 -

       A.     The Administrative Charge. ...............................................- 6 -

       B.     Verizon Fails to Disclose the Administrative Charge to Customers
              When They Sign Up..............................................................- 7 -

              1.     Verizon Fails to Disclose the Administrative Charge
                     In Retail Stores. .......................................................- 8 -

              2.     Verizon Fails to Disclose the Administrative Charge
                     In Telesales or Online Chat Sales. .........................- 9 -

              3.     Verizon Fails to Disclose the Administrative Charge
                     On Its Website Advertising. ...................................- 10 -

       C.     Verizon Continues to Deceive Customers After They Sign Up. ...................- 11 -

       D.     Customers Cannot Cancel Without Penalty.................................- 17 -

V.     PLAINTIFFS' FACTUAL ALLEGATIONS .........................................- 20 -

       Plaintiff Teresa MacClelland ........................................................- 20 -

       Plaintiff Karen Umberger...............................................................- 24 -

       Plaintiff Scott Willits.....................................................................- 27 -

       Plaintiff Michael Branom................................................................- 31 -

       Plaintiff Molly Brown ....................................................................- 33 -

       Plaintiff Michael Carney ................................................................- 36 -

       Plaintiff Tim Frasch .......................................................................- 39 -

       Plaintiff Patricia Gagan ..................................................................- 42 -

       Plaintiff Anna Gutierrez .................................................................- 45 -

       Plaintiff Linda Jenkins ...................................................................- 49 -

       Plaintiff Augustus Johnson .............................................................- 52 -

       Plaintiff William Kaupelis ..............................................................- 55 -

       Plaintiff Marilyn Kaye ...................................................................- 58 -

       Plaintiff Janette Lisner ...................................................................- 61 -

       Plaintiff William Eric Lough ..........................................................- 63 -

Plaintiff David Massaro ............................................................. - 66 -

Plaintiff Louise Monsour .......................................................... - 69 -

Plaintiff Darleen Perez ............................................................. - 72 -

Plaintiff Gabrielle Pozzuoli ...................................................... - 75 -

Plaintiff Valerie Reed ............................................................... - 78 -

Plaintiff Bruce Schramm ........................................................... - 81 -

Plaintiff Kerry Showalter .......................................................... - 84 -

Plaintiff John St.Jarre ............................................................... - 87 -

Plaintiff Gloria Stern ................................................................ - 90 -

Plaintiff Edna Toy .................................................................... - 93 -

Plaintiff Teresa Toy .................................................................. - 96 -

Plaintiff Vanessa West .............................................................. - 99 -

VI.    CLASS ALLEGATIONS........................................................ - 102 -

CAUSES OF ACTION ...................................................................... - 105 -

COUNT I: Violation of the Consumers Legal Remedies Act
("CLRA") California Civil Code § 1750 *et seq.* ............................ - 105 -

COUNT II: Violation of California's False Advertising Law
California Business and Professions Code § 17500 *et seq.* ............ - 111 -

COUNT III: Violation of California's Unfair Competition Law
California Business and Professions Code § 17200 *et seq.* ............ - 114 -

COUNT IV: Breach of the Implied Covenant of Good Faith and
Fair Dealing.................................................................................... - 118 -

PRAYER FOR RELIEF...................................................................... - 120 -

DEMAND FOR JURY TRIAL........................................................... - 122 -

Plaintiffs Teresa MacClelland, Karen Umberger, Scott Willits, Michael Branom, Molly Brown, Michael Carney, Tim Frasch, Patricia Gagan, Anna Gutierrez, Linda Jenkins, Augustus Johnson, William Kaupelis, Marilyn Kaye, Janette Lisner, William Eric Lough, David Massaro, Louise Monsour, Darleen Perez, Gabrielle Pozzuoli, Valerie Reed, Bruce Schramm, Kerry Showalter, John St. Jarre, Gloria Stern, Edna Toy, Teresa Toy, and Vanessa West, individually, as private attorneys general, and on behalf of all others similarly situated, allege as follows, on personal knowledge and investigation of their counsel, against Defendants Cellco Partnership d/b/a Verizon Wireless and Verizon Communications Inc. (hereinafter, "Verizon" or "Defendants"):

# I. **INTRODUCTION**

1. This case challenges a deceptive pricing scheme perpetrated by Verizon against its wireless service customers. Verizon prominently advertises particular flat monthly rates for its postpaid wireless service plans. Then, after customers sign up, Verizon actually charges higher monthly rates than advertised and promised by padding the bill with an invented and undisclosed so-called "Administrative Charge." Verizon unilaterally sets the amount of the so-called Administrative Charge at its sole discretion. The Administrative Charge is simply a means for Verizon to charge more per month for the service itself without having to advertise the higher prices.

2. Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills in September 2005, initially at a rate of $0.40 per month for each phone line. Since then, Verizon has repeatedly increased the amount of the Administrative Charge. The current amount of the Administrative Charge is $1.95 per month for each phone line—a nearly 5X increase from the original amount of the charge. Verizon has used the Administrative Charge as a revenue lever to covertly jack up its monthly service prices and to squeeze its existing subscribers for more cash whenever Verizon desires. To date, Verizon has improperly collected over $1 billion in additional charges from its California subscribers through its Administrative Charge scheme.

3. The first time Verizon customers can possibly learn about the existence of the

Administrative Charge, or its amount, is on the online version of their monthly billing statements—which they can only view online, and which they can only access *after* they sign up for the service and cannot cancel without penalty.

4.  For those customers who receive a mailed paper bill, Verizon provides no notice about the amount of the Administrative Charge. There is no line item or listed amount for the Administrative Charge on the paper bill; the mailed paper bill appears to be an abridged version of the full online PDF version of the bill.

5.  For those customers who are signed up for electronic billing and/or Auto Pay (automatic payment), Verizon gives notification by email or text message only of the total monthly charge, without listing or disclosing the existence of the Administrative Charge. Only if those customers then created an online My Verizon profile to connect to their customer account could the customer login and then view and download the full version of the bill, which is only available as an online PDF.

6.  However, even if a customer found and viewed the full PDF version of the bill, Verizon there deliberately and affirmatively misrepresents the so-called Administrative Charge. On the full PDF version of the bill, Verizon excludes the Administrative Charge from the "Monthly charges" section, and instead puts the Administrative Charge in the "Surcharges" section where Verizon lumps it together with government costs. Even worse, Verizon explicitly and falsely states that the Administrative Charge is a "Surcharge" imposed on subscribers to "cover the costs that are billed to us by federal, state or local governments."

7.  Thus, by Verizon's own design, the monthly billing statements (whether printed or electronic) serve to further Verizon's scheme and keep customers from realizing they are being overcharged.

8.  Meanwhile, on a support page on its website, where it will not be viewed by customers prior to their purchases, Verizon gives a *different* definition of the Administrative Charge, claiming it is tied to various of Verizon's operating costs including telephone company interconnect charges and network facility and service fees—i.e., the basic costs of providing wireless service, which a reasonable consumer would expect to be included in the advertised

price for the wireless service plan.

9. Moreover, the Administrative Charge is *not*, in fact, tied to Verizon's costs such as interconnect charges and network facility fees. Verizon does not adjust the amount of the Administrative Charge based on changes to Verizon's costs. Rather, Verizon sets and increases the amount of the Administrative Charge based on company-wide operating income targets set by Verizon senior management. Verizon simply uses the Administrative Charge as a revenue lever to covertly jack up its monthly service prices and to increase its revenues whenever it desires. This is corroborated by the fact that Verizon has more than doubled the amount of the monthly Administrative Charge since 2015 (from $0.95 to $1.95), while during that same time period, such costs have actually significantly *decreased* (like interconnection costs).

10. Meanwhile, Verizon's failure to include a line item for the Administrative Charge on its printed bills, and Verizon's false statement on the full PDF version of the bill (which is only available online) that the Administrative Charge recovers the costs billed to Verizon by the government, are intended to ensure that customers do not notice or question the Administrative Charge.

11. In all events, Verizon should clearly and accurately state the true monthly prices for its postpaid wireless service plans in its price representations and advertising. Verizon has failed to do so, and continues to fail to do so.

12. Plaintiffs, by this action, seek a public injunction for the benefit of the general public to: (1) enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public; (2) enjoin Verizon from advertising or quoting a wireless service plan price to members of the general public if that price does not include applicable discretionary monthly service fees or charges, such as the Administrative Charge; and (3) enjoin Verizon from representing or stating to members of the public that the Administrative Charge is a tax, a charge imposed to recover costs billed to Verizon by the government, a pass-through government cost, a government or regulatory fee, or a charge over which Verizon has no control.

13. Plaintiffs further seek, on behalf of themselves and a class of all similarly

situated California consumers, restitution and/or damages, pre- and post-judgment interest, and permanent private injunctive relief. Plaintiffs also seek attorneys' fees and costs.

14. To be clear, Plaintiffs are *not* seeking to regulate the existence or amount of the Administrative Charge. Rather, Plaintiffs want Verizon to include the amount of the Administrative Charge in the wireless service plan prices it advertises to the general public, and to honestly and adequately disclose the Administrative Charge and its true nature and basis in Verizon's billing statements and in Verizon's communications with subscribers.

## II.   **THE PARTIES**

15. Plaintiff Teresa MacClelland is a citizen and resident of Eureka, California.

16. Plaintiff Karen Umberger is a citizen and resident of Eureka, California.

17. Plaintiff Scott Willits is a citizen and resident of Eureka, California.

18. Plaintiff Michael Branom is a citizen and resident of Pasadena, California.

19. Plaintiff Molly Brown is a citizen and resident of Novato, California.

20. Plaintiff Michael Carney is a citizen and resident of Los Angeles, California.

21. Plaintiff Tim Frasch is a citizen and resident of Gilroy, California.

22. Plaintiff Patricia Gagan is a citizen and resident of Los Angeles, California.

23. Plaintiff Anna Gutierrez is a citizen and resident of Whittier, California.

24. Plaintiff Linda Jenkins is a citizen and resident of Valencia, California.

25. Plaintiff Augustus Johnson is a citizen and resident of Eureka, California.

26. Plaintiff William Kaupelis is a citizen and resident of Placentia, California.

27. Plaintiff Marilyn Kaye is a citizen and resident of Chatsworth, California.

28. Plaintiff Janette Lisner is a citizen and resident of Tarzana, California.

29. Plaintiff William Eric Lough is a citizen and resident of Wildomar, California.

30. Plaintiff David Massaro is a citizen and resident of Yucaipa, California.

31. Plaintiff Louise Monsour is a citizen and resident of Eureka, California.

32. Plaintiff Darleen Perez is a citizen and resident of Long Beach, California.

33. Plaintiff Gabrielle Pozzuoli is a citizen and resident of Woodland Hills, California.

34. Plaintiff Valerie Reed is a citizen and resident of Eureka, California.

35. Plaintiff Bruce Schramm is a citizen and resident of Tarzana, California.

36. Plaintiff Kerry Showalter is a citizen and resident of Newbury Park, California.

37. Plaintiff John St.Jarre is a citizen and resident of Wildomar, California.

38. Plaintiff Gloria Stern is a citizen and resident of Temecula, California.

39. Plaintiff Edna Toy is a citizen and resident of Sacramento, California.

40. Plaintiff Teresa Toy is a citizen and resident of San Bruno, California.

41. Plaintiff Vanessa West is a citizen and resident of Woodland Hills, California.

42. Defendant Cellco Partnership d/b/a Verizon Wireless is a wholly-owned subsidiary of Verizon Communications Inc., and is chartered under the laws of Delaware, with its principal place of operations and nerve center in New Jersey.

43. Defendant Verizon Communications Inc. is chartered under the laws of Delaware, with its principal place of operations and nerve center in New Jersey.

## III.    JURISDICTION AND VENUE

44.    **Subject Matter Jurisdiction**. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy, exclusive of interest and costs, exceeds $5,000,000, and this is a proposed class action in which there are members of the proposed Class who are citizens of a state different from the Defendants.

45.    **Personal Jurisdiction**. This Court has personal jurisdiction over Verizon because, without limitation, Verizon: (1) has purposely availed itself of the privileges of conducting business activities in California; (2) currently maintains systematic and continuous business contacts with California including marketing, selling, and issuing wireless services to Plaintiffs and other California consumers; and (3) maintains offices and retail locations throughout California. Verizon has sufficient minimum contacts with California to render the exercise of jurisdiction by this Court permissible.

46.    **Venue**. Venue is proper pursuant to 28 U.S.C. §1391 because many of the Plaintiffs reside in this District (including Plaintiffs Teresa MacClelland, Karen Umberger, Scott Willits, Molly Brown, Tim Frasch, Augustus Johnson, Louise Monsour, Valerie Reed,

and Teresa Toy); many of the acts and transactions giving rise to this action occurred in this District; Verizon is authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District through distribution and sale of its services in this District, does substantial business in this District, and is subject to personal jurisdiction in this District.

## IV. FACTUAL ALLEGATIONS OF VERIZON'S ADMINISTRATIVE CHARGE SCHEME

47.     Verizon falsely advertises its wireless services at lower monthly rates than it actually charges customers by not disclosing, and not including in the advertised price, a so-called "Administrative Charge" which Verizon imposes on all postpaid wireless service customers each month.

48.     Verizon uses the Administrative Charge to (1) charge more per month for the service itself without having to advertise the higher prices, and (2) as a way to covertly jack up the rates of its existing subscribers to extract additional revenue from its subscribers whenever it desires.

### A. The Administrative Charge.

49.     The Administrative Charge is a uniform, per-phone line flat charge that Verizon adds to the monthly bills of all Verizon postpaid wireless service customers across the country. Verizon unilaterally sets the amount of the Administrative Charge at its sole discretion.

50.     Verizon first began imposing the Administrative Charge in September 2005, at an initial rate of $0.40 per month per phone line. The charge was added to the bills of all postpaid wireless customers, including customers who had signed up for the services well before the Administrative Charge even existed. Verizon increased the Administrative Charge to $0.70 per month per line in starting in March 2007. Until December 2015, the Administrative Charge remained under a dollar per month per phone line. In December 2015, Verizon raised the Administrative Charge from $0.95 to $1.23 per month per phone line. Verizon increased the Administrative Charge to $1.78 per month per phone line starting in August 2019. Verizon then raised the Administrative Charge to the current rate of $1.95 per month per phone line starting

in August 2020. Notably, the Administrative Charge has *more than doubled* since December 2015, from $0.95 to $1.95 per month per phone line.

51.     To date, Verizon has improperly collected over $1 billion in additional charges from its California subscribers through its Administrative Charge scheme.

**B.     <u>Verizon Fails to Disclose the Administrative Charge to Customers When They Sign Up.</u>**

52.     At all relevant times, Verizon has aggressively advertised its postpaid wireless service plans through pervasive marketing directed at the consuming public in California and throughout the United States, including via high-profile television, radio, and online advertisements, and on its website and through materials at its numerous corporate-owned retail stores and at the stores of third party retailers (e.g., Costco, Best Buy, the Apple Store, and independent "Verizon Authorized Retailers") where customers can sign up for Verizon wireless services.

53.     In all of these locations and through all of these channels, Verizon consistently and prominently advertises particular flat monthly prices for its postpaid wireless service plans, without disclosing or including the Administrative Charge in the advertised price. Neither the existence nor amount of the Administrative Charge (let alone its true nature or basis) is disclosed to customers prior to or at the time they sign up for Verizon's service plans.

54.     By way of example only, Verizon ran three broad-scale national television advertisements in 2019, 2020, and 2021 that promoted the price for its postpaid wireless service plans as $35 per line per month per line when purchasing four lines.[1] The flat monthly rate was prominently featured in the advertisements. There was *no asterisk* next to the advertised price, and the only disclosure language was the phrase "Plus taxes and fees," below the monthly rate. The advertisements did not mention the Administrative Charge or what the additional "fees" were or their amounts. Nor were the viewers directed anywhere to learn about the additional

---

[1] The 2021 ad can be viewed at: https://www.youtube.com/watch?v=O9Bh4EJPOKA.
The 2020 ad can be viewed at: https://www.youtube.com/watch?v=LFP9zmeS75I.
The 2019 ad can be viewed at: https://www.youtube.com/watch?v=jGBgLCFFVQA.

"fees."

55.     As another example, Verizon ran similar broad-scale national television advertisements in 2017 and 2018 that promoted the price for its postpaid wireless service plans as $40 per line per month when purchasing four lines.[2] These ads, too, had no asterisk next to the advertised price, and the only disclosure language was the phrase "Plus taxes and fees," below the monthly rate. The advertisements did not mention the Administrative Charge or what the additional "fees" were or their amounts. Nor were the viewers directed anywhere to learn about the additional "fees."

56.     The phrase "Plus taxes and fees" does not constitute an adequate disclosure of the Administrative Charge by Verizon, and is understood by the reasonable consumer to refer to legitimate taxes and government-related fees passed on by Verizon to its customers. (Meanwhile, on the customer bill, Verizon labels the Administrative Charge as a "Surcharge" next to government-related surcharges, and not as a "fee.") Moreover, the Administrative Charge is, in fact, simply a disguised double-charge for the service itself.

**1.     Verizon Fails to Disclose the Administrative Charge In Retail Stores.**

57.     For years, when a consumer shops for a wireless service plan at a Verizon corporate-owned store, the consumer is presented with the advertised and quoted monthly service plan prices, and nothing is disclosed to the consumer about the existence of the Administrative Charge. The Verizon stores use a uniform sales process in which a sales representative utilizes a proprietary sales application on an in-store iPad. Verizon does not disclose the Administrative Charge anywhere during this in-store sign-up process. Verizon agents only tell customers the monthly plan price during this process (e.g., the "$80/month Unlimited plan"), and never mention the $1.95 per-line so-called "Administrative Charge." Customers and prospective customers are not given the option to view the total monthly charges on the in-store iPad sales application, and sales agents are unaware of (or are trained to

---

[2] The 2018 ad can be viewed at: https://www.ispot.tv/ad/dogb/verizon-unlimited-plans-huge-news-ft-thomas-middleditch.
The 2017 ad can be viewed at: https://www.youtube.com/watch?v=41lGIXfLfjo.

pretend to be unaware of) details beyond the fact that *taxes* will be charged on top of the advertised monthly service plan price.

58.     In fact, the first time consumers can possibly learn about the existence of the Administrative Charge, or its amount, is on their online monthly billing statement *after* signing up—but consumers are not provided access to the online billing statement until at least one week after they sign up for the service and are financially committed to their purchase.

59.     Customers may also sign up for Verizon wireless service plans at certain authorized third-party retail stores such as Costco, Apple, Best Buy, Walmart, Target, and independently-owned "Verizon Authorized Retailers." The customer experience in these stores is, in all material respects pertinent to this action, the same as in Verizon corporate-owned stores. Thus, if a consumer shops for a Verizon wireless service plan at a third-party retailer, the consumer is presented with the advertised and quoted monthly service plan prices, and nothing is disclosed to the customer about the Administrative Charge. At these stores, like at the Verizon corporate-owned stores, the customer purchase process is conducted through a tablet or other electronic display, the relevant content of which is determined by Verizon and does not include a disclosure of the Administrative Charge. The pricing information and disclosures which are provided to customers in third-party stores are provided to the third-party retailers by Verizon.

**2.     Verizon Fails to Disclose the Administrative Charge In Telesales or Online Chat Sales.**

60.     Likewise, Verizon sales and customer service agents have been trained for years, as a matter of company policy, to present consumers with the advertised flat monthly prices for its service plans without disclosing the Administrative Charge. If a potential customer calls Verizon's customer sales agents, or reaches out via web chat, and asks what if any other monthly charges will be added, the agents as a matter of company policy falsely say that the only additions to the advertised prices (besides subscriptions to extra services or features) are taxes or government-related fees that are outside of Verizon's control.

1

2

**3.** **Verizon Fails to Disclose the Administrative Charge On Its Website Advertising.**

3

61.     Likewise, for years, Verizon's consumer website has advertised its postpaid

4   wireless service plans by prominently featuring flat monthly prices for its service plans which

5   do not include the amount of the Administrative Charge.

6

62.     For example, when this case was filed, Verizon's website listed five postpaid

7   wireless plan options under its postpaid "Unlimited" plans, and a configurator which showed

8   different prices per line for each plan depending on how many lines (between one and four) the

9   consumer selected.  See the screenshot of the Verizon website taken on October 31, 2021 at

10  **Figure 1** below:

11  **Figure 1**

12
13
14
15
16
17
18
19
20



It's Unlimited built right.

Only pay for what you need and get more of the entertainment you want. Choose your Unlimited plans to mix, match and save.

**How many lines do you need?**

⊖ **4** ⊕

Prices include $10/mo savings per line, when you sign up for paper-free billing and Auto Pay. ⊙

Overview | Compare

**Start Unlimited**

Get started with unlimited talk, text and data and never worry about overage charges again.

**$35**
Per line per month. Plus taxes & fees.

**Play More Unlimited**

Our best plan for streaming, with tons of shows, movies and sports and premium network access—all included.

**$45**
Per line per month. Plus taxes & fees.

**Do More Unlimited**

When productivity is your top priority, get it all done with premium data and a discount on a connected device plan.

**$45**
Per line per month. Plus taxes & fees.

**Get More Unlimited**

Experience our ultimate in performance on our best plan with extra features, including more music and entertainment.

**$55**
Per line per month. Plus taxes & fees.

**Just Kids**

Manage screen time, filter content, track location and get Unlimited data on your kid's first phone, so you get peace of mind.

**$35**
Per line per month. Plus taxes & fees. Requires 1 line on Unlimited.

21

63.     Each of these options is presented as having a flat rate per month. The price does

22  not have an asterisk and the only disclosure language is below the price, stating: "Plus taxes &

23  fees." Customers can click a link directly under those advertised prices to sign up for those

24  services. Neither the existence nor the amount of the Administrative Charge (which is in fact an

25  additional $1.95 per month per line, e.g., $7.80 per month for four lines) is disclosed, even

26  though Verizon intends to charge the Administrative Charge and knows its exact amount.

27

64.     The "Plus taxes and fees" language does not constitute an adequate disclosure

28  because a reasonable consumer would understand "taxes and fees" to mean legitimate taxes and

government-related fees passed on by Verizon to its customers (as opposed to a disguised double-charge for the service itself). In fact, throughout the order process and on the final order page, Verizon displays a line item charge labeled "Taxes and government fees"; the line item can be expanded (by clicking a "+" sign) to display a list of the component (and legitimate) taxes and government fees. Thus, a reasonable consumer would assume and understand that *those* are the taxes and fees to which the phrase "Plus taxes & fees" in Verizon's ads refers. (Notably, on the customer bill itself, Verizon labels the Administrative Charge not as a "fee," but rather, as a "Surcharge.") Meanwhile, throughout the online purchase process, Verizon has no line item which contains or includes the Administrative Charge, and Verizon never includes the amount of the Administrative Charge in the presented and quoted monthly "Total" price.

## C. <u>Verizon Continues to Deceive Customers After They Sign Up.</u>

65. Verizon continues to deceive customers about the Administrative Charge and the true monthly price of the services, even after they have signed up for the services.

66. The first time Verizon customers can possibly learn about the existence of the Administrative Charge, or its amount, is on the online version of their monthly bills—which they can *only* view online, and which they can only access *after* they sign up for the service and cannot cancel without penalty.

67. For those customers who receive a mailed paper bill, Verizon provides no notice whatsoever about the amount of the Administrative Charge. The paper bill does not contain a line item or listed amount for the Administrative Charge; the mailed paper bill appears to be an abridged version of the full online PDF version of the bill.

68. For example, below (**Figure 2**) is a photo of Page 1 of the paper bill mailed to Plaintiff Janette Lisner for the billing period January 23, 2020 – February 22, 2020.

**Figure 2: Verizon's Mailed Paper Bill**

Page 1 of Plaintiff Janette Lisner's February 22, 2020 Bill



69.      Page 1 of Ms. Lisner's paper bill (above) lists a monthly total charge of $69.57. On the right side of Page 1 of the bill is a column which contains a sentence that states: "The total amount due for this month includes surcharges of $2.46 and taxes and gov fees of $2.11." *Nowhere* on the printed bill is there a further breakdown of the component items of the "surcharges" or "taxes and gov fees" and their individual amounts. *Nowhere* on the bill is there a line item for the Administrative Charge or any information regarding its amount.

70.      For those customers who are signed up for electronic billing and/or Auto Pay (automatic payment), Verizon gives notification by email or text message of only the total monthly charge, without listing or disclosing the existence of the Administrative Charge. Only if those customers created an online My Verizon profile to connect to their customer account could the customer login and get access to the full PDF version of the bill.

71.      Even if a customer created a My Verizon profile and took actions to view the electronic version of the bill on the My Verizon app or website, the My Verizon billing center is further designed to hide the Administrative Charge. The default view for the Verizon bill on

the My Verizon app or website includes only the total monthly charge, and does not include any more detail or line items.

72. If the customer desired to view the *full* detailed version of the bill (which is accessible *only* online, and only as a PDF), the customer would need to figure out how to navigate to and download and view the PDF file of the bill in the My Verizon app or website.

73. For those customers who find and view the full PDF bill, Verizon then makes intentional misrepresentations about its plan prices and the nature of the Administrative Charge. On the full PDF version of the bill, Verizon excludes the Administrative Charge from the "Monthly charges" section, and instead puts the Administrative Charge in the "Surcharges" section where Verizon lumps it together with government costs. **Even worse, Verizon explicitly and falsely states that the Administrative Charge is a "surcharge" imposed on subscribers to "cover the costs that are billed to us by federal, state or local governments."**

74. Below (**Figure 3**) is an image of the first page of Plaintiff Scott Willits' full PDF August 2021 bill, which was only available online. There Verizon declares that "Surcharges" (which is how Verizon labels the Administrative Charge) are to "cover the costs that are billed to us by federal, state or local governments." A red box is added to the bill image below to highlight the relevant text:

**Figure 3**

# Your August bill is $134.15

It's due on Aug 25, 2021.You have Auto Pay scheduled for Aug 22, 2021.

**4 GB** of 4 GB used in this bill
**1.41 GB** of 1.41 GB extra used in this bill
**0.11 GB** data overage used in this bill
**0.89 GB** carried over to your next bill

| | |
|---|---|
| Account charges | $65.00 |
| **Scott Willits**<br>707- ■■■■■ | $23.05 |
| **Scott Willits**<br>707- ■■■■■ | $23.05 |
| **Scott Willits**<br>707- ■■■■■ | $23.05 |
| | $134.15 |

**Balance forward from last bill**

| | |
|---|---|
| Previous balance (through Jul 2) | $119.15 |
| Payment received - Thank you (Jul 22) | -$119.15 |
| **Total balance forward** | $0.00 |

Your August bill is $15.00 higher than last month's. Your August bill of $134.15 is due on Aug 25, 2021. You can see a full breakdown of all this month's charges on go.vzw.com/mybill.

**Good to know**

**Account charges**

These apply to your entire account. Account charges may include Add-ons, such as device protection, Services, such as call blocking, or Late Fees for past due balances. They are separate from charges per line or device.

**Check your online bill for all surcharges, taxes and gov fees**

The total amount due for this month includes surcharges of **$7.83** and taxes and gov fees of **$1.32**. For an itemized list of taxes, fees and surcharges visit go.vzw.com/mybill.

**Surcharges**

These cover the costs that are billed to us by federal, state or local governments so we can continue to provide you with the best service. See the full breakdown on go.vzw.com/mybill.

- 14 -

75.     Below (**Figure 4**) is the third page of Mr. Willits' same August 2021 bill, where Verizon labels the so-called Administrative Charge as such a "Surcharge," i.e., as a charge imposed on subscribers to recover costs billed to Verizon by the government. A red box is added to highlight the Administrative Charge:

**Figure 4**



| Account Charges | $65.00 |
|---|---|

0.89 GB of unused data will carry over to next month (Aug 3 - Sep 2)

Unused Carryover data from last month expired August 2.

You'll be charged a late fee when you don't pay your bill on time. The amount is the greater of $5 or 1.5% of the unpaid balance, or as allowed by law in the state of your billing address.

| One-time charges and credits | $15.00 |
|---|---|
| Data Overage - 1 Additional GB At $15/GB | $15.00 |

| Monthly charges and credits | $50.00 |
|---|---|
| The new Verizon Plan Medium 4 GB (Aug 3 - Sep 2)<br>4 GB Shared Data, Carryover Data, Unlimited Talk and Text | $50.00 |

| Shared data usage | Used/Allowance |
|---|---|
| All shared lines | 5.52 / 5.41 GB |

| Types of data you used | Used/Allowance |
|---|---|
| The new Verizon Plan Medium 4 GB | 4 / 4 GB |
| Carryover from last month (Jul 3 - Aug 2) | 1.41 / 1.41 GB |
| Overage | 0.11 / 1 GB |

**Scott Willits** — $23.05

707-███████

SAMSUNG GALAXY S7
BLACK 32GB

| Monthly charges and credits | $20.00 |
|---|---|
| Smartphone Line Access (Aug 3 - Sep 2) | $20.00 |

| Surcharges | $2.61 |
|---|---|
| Fed Universal Service Charge | $0.45 |
| Regulatory Charge | $0.21 |
| Administrative Charge | $1.95 |

| Taxes and gov fees | $0.44 |
|---|---|
| CA State 911 Surcharge | $0.30 |
| CA Teleconnect Fund Surchg | $0.01 |
| CA State High Cost Fund (A) | $0.01 |

76.     As reflected above, Verizon excludes the Administrative Charge from the "Monthly charges and credits" section of the full PDF bill. Verizon instead disguises the invented Administrative Charge by putting it in the "Surcharges" section where it is lumped together with true government costs billed to Verizon such as the "Federal Universal Service Charge."

77.     Verizon's labeling and description of the Administrative Charge as a "Surcharge" imposed on subscribers to "cover the costs that are billed to us by federal, state or local governments" is a false statement of material fact intended to fool its subscribers.

78.     Notably, on a support page on its website, Verizon gives a *different* definition of the Administrative Charge, claiming it is charged to "defray" "charges we, or our agents, pay local telephone companies for delivering calls from our customers to their customers" (i.e., interconnect charges) and "fees and assessments on our network facilities and services." But interconnect charges and network facility and service fees are the basic costs of providing wireless service, which a reasonable consumer would expect to be included in the advertised price for the wireless service plan. To the extent that some part of the Administrative Charge is used to defray an actual cost imposed on Verizon by a government, that part is minuscule and immaterial.

79.     Moreover, the amount of the Administrative Charge that Verizon chooses to impose is *not*, in fact, tied to Verizon's costs such as interconnect charges and network facility and service fees. Verizon does not adjust the amount of the Administrative Charge based on changes to Verizon's <u>costs</u>. Rather, Verizon sets and increases the amount of the Administrative Charge based on company-wide <u>operating income targets</u> set by Verizon senior management. Verizon uses the Administrative Charge as a revenue lever to covertly jack up its monthly service prices and to squeeze its existing subscribers for more cash whenever Verizon desires. This is corroborated by the fact that Verizon has more than doubled the amount of the monthly Administrative Charge since 2015 (from $0.95 to $1.95), while during that same time period, such costs have actually significantly *decreased* (like interconnection costs).

80.     Thus, by Verizon's own design, the monthly billing statements (whether printed

or electronic) serve to further Verizon's scheme and keep customers from realizing they are being overcharged.

81.     And, because Verizon has increased the Administrative Charge by less than a dollar each time, if a customer noticed that the bill total was slightly higher than the previous month, the customer would reasonably assume that the increase was a result of legitimate taxes and other government-related charges, which customers understand can vary month-to-month.

**D.     Customers Cannot Cancel Without Penalty.**

82.     Even if a customer notices the Administrative Charge on the very first bill, Verizon's stated and posted policies prevent its customers from backing out of the deal without penalty.[3]

83.     First, when customers sign up they pay a one-time activation fee of $35.00 that is refundable for only three days—well before they receive access to their first monthly bill, which does not occur until more than a week after they sign up.

84.     Second, customers who signed up for a two-year service commitment (the majority of customers until at least 2016) are charged an early termination fee of up to $350 if they cancel their service more than 14 days after purchase (again, the customers cannot even receive notice of their first billing statement until at least a week after signing up). And, even if a person managed to cancel his or her service within the 14-day period (which required returning all purchased equipment in that time period), the customer *still* was required to pay for his or her service through the date of cancellation.

85.     Third, many customers purchase devices (such as new phones) with their service plans; indeed, Verizon markets devices and wireless service plans in bundles. The devices can only be returned to Verizon within the first 30 days after purchase. If customers return a device within 30 days of purchase, they still must pay a $50 restocking fee. If they wait longer than 30 days, it is too late, and they are on the hook for the full purchase price of the device.

86.     Fourth, since approximately 2013, Verizon has offered installment plans to pay

---

[3] E.g., *see* Verizon's description of its return policy posted on its website at https://www.verizon.com/support/return-policy, last accessed on October 31, 2021.

for new devices that are tied to customers' service plans. Instead of a one-year or two-year service commitment, most Verizon wireless customers today ostensibly have a month-to-month service plan but sign 24-month or 30-month installment agreements with Verizon under which customers pay for their mobile phone (i.e., the device) in monthly installments. For example, a customer would pay, for an $800 phone, an equipment "installment" charge of $33.33 on each monthly Verizon bill for 24 months. If a customer cancels his or her wireless service plan any time before the installment plan is paid off, the full outstanding balance of the device becomes due immediately in a single balloon payment. Even if the customer noticed the Administrative Charge on his or her very first monthly statement (despite Verizon's efforts to disguise it and to falsely describe it as a government cost), and the customer thereby immediately chooses to cancel her service, Verizon will demand that the customer immediately pay the entire remaining $800 balance all at once. (If the customer returns the device within the 30-day return deadline, the customer must still pay the restocking fee mentioned above.) In this way the installment plan balloon payment is similar to an early termination fee, creating a large immediate cost to cancelling the Verizon service plan once customers learn the actual monthly prices of their plans are higher than advertised.

87. The activation fee, restocking fee, early termination fee, and installment balloon payment all function as ways to penalize and deter customers from cancelling after signing up, and Verizon's policies (including the cancellation/return periods and how they relate to the timing of the billing statements) are deliberately and knowingly designed by Verizon to lock customers in if and when they deduce that they are being charged more per month than advertised.

88. Because both the initial amount of the Administrative Charge was less than a dollar and each of the subsequent increases to the Administrative Charge have been by less than one dollar each, Verizon knows that customers are unlikely to notice the increased charge on the total price of their monthly bills. Given that taxes and other government-related charges can already vary by amounts smaller than one dollar from month to month, Verizon knows that customers reasonably expect small changes in the total amount billed each month and will not

be able to tell that Verizon imposed or increased the Administrative Charge simply by comparing the total amount billed that month to the total billed in the prior month or months.

89. Each time that Verizon has increased the amount of the Administrative Charge, Verizon has intentionally not identified or disclosed on the first bill containing the increase that the Administrative Charge is higher than it was in the previous month. Even a customer who noticed the higher total charge and who then examined the full billing statement would have no notice that Verizon had increased the amount of the Administrative Charge.

90. The only place Verizon mentions to existing customers that it plans to increase the Administrative Charge is on the monthly billing statement *prior* to the month it is actually raised, and even then, each time the Administrative Charge was increased, Verizon buried that inadequate "disclosure" at the very end of the bill, among a mix of information and notices unrelated to price increases.

91. For example, when Verizon increased the Administrative Charge to its current rate of $1.95 per month in August 2020, Verizon hid the only mention of the increase at the very end of the full PDF bill issued *prior* to bill that contained the actual increase. The mention was buried on this prior bill eleven paragraphs into a seldom-read section titled "Additional Information." The first ten paragraphs preceding it were standard paragraphs found in nearly every monthly bill, and covered arcane topics like "Customer Proprietary Network Information (CPNI)" and topics irrelevant to most customers. Neither the title of this section nor the first ten paragraphs would alert customers that a *price increase* would be announced below in the eleventh paragraph.

92. Even if customers noticed that Verizon imposed or increased the Administrative Charge, they would have to pay penalties at that point if they wanted to cancel their Verizon service. Verizon has drafted its contractual terms regarding cancellation fees and the like so that there are no exceptions, meaning these cancellation fees and similar costs would apply no matter how high Verizon chose to unilaterally increase the Administrative Charge.

93. Further, as described above in Section IV(C), Verizon has designed its monthly billing statements (both paper and electronic) to further Verizon's scheme and keep customers

from realizing they are being overcharged.

94.   Regardless, Verizon should be including the amount of the Administrative Charge as part of the advertised monthly price for its service plans, which as discussed herein it has never done and still does not do. Verizon's failure to do so, in and of itself, constitutes an unfair and deceptive practice that is actionable under the claims pled herein. Verizon uses the Administrative Charge to charge more than advertised for its services, and as a lever to covertly and improperly raise additional cash from its existing customers at Verizon's desire.

95.   To be clear, Plaintiffs are *not* seeking to regulate the existence or amount of the Administrative Charge. Rather, Plaintiffs want Verizon to include the amount of the Administrative Charge in the wireless service plan prices it advertises to the general public, and to honestly and adequately disclose the Administrative Charge and its true nature and basis in Verizon's bills and in Verizon's communications with its subscribers.

## V.   **PLAINTIFFS' FACTUAL ALLEGATIONS**

**Plaintiff Teresa MacClelland**

96.   Plaintiff Teresa MacClelland is, and at all relevant times has been, a citizen and resident of Eureka, California.

97.   Ms. MacClelland has been a continuous Verizon postpaid wireless customer since at least 2008. She initially signed up on or around 2008 for Verizon postpaid wireless service for her family in a Verizon corporate-owned store located in Eureka, California. She signed up for two-year service contracts for four phones for herself, her husband, and her two children. She also purchased four new phones along with the service contracts, as part of a bundle.

98.   When Ms. MacClelland purchased her wireless service plan for the four phone lines, Verizon prominently advertised and quoted, to Ms. MacClelland and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. MacClelland, at any time before or when she signed up, that Verizon would charge her the Administrative Charge on top of the advertised and promised monthly price.

99.   Verizon charged Ms. MacClelland an Administrative Charge of $0.70 per month

per line beginning on her first bill.  Ms. MacClelland did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

100.     Verizon has continued to charge Ms. MacClelland an Administrative Charge on each of her four phone lines every month from 2008 through the present.

101.     During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. MacClelland several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month (totaling $4.92 per month for all four phone lines). In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month (totaling $7.12 per month for all four phone lines). In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month (totaling $7.80 per month for all four phone lines), which is the current amount as of this filing.

102.     Through its imposition of the Administrative Charge, Verizon has for 13 years charged Ms. McClelland a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

103.     Since 2008, Ms. MacClelland has changed her Verizon service plan for the four phone lines a few times. Ms. MacClelland has also purchased approximately a dozen or so mobile phones over the years from Verizon for the four phone lines, typically once every couple of years. Prior to 2014, Ms. McClelland would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. On or after 2014, Ms. MacClelland typically purchased new phones from Verizon on 24-payment device installment plans.

104.     Ms. MacClelland last updated her wireless service plan on or around 2016, at the same time that she purchased two Google Pixel 1 phones on 24-payment device installment plans. On or around 2019, Ms. MacClelland replaced her Google Pixel 1 phones with new Google Pixel 3 phones, purchasing them on 24-payment device installment plans, but she did not update her service plan at that time.

105.     Each and every time since 2008 that Ms. MacClelland changed her wireless

service plan or purchased a new mobile phone, she did so in person at the Verizon corporate-owned store located in Eureka, California.

106. Each and every time that Ms. MacClelland changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. MacClelland and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. MacClelland did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge, which Verizon charged on each of her lines). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. MacClelland purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to her.

107. In particular, since approximately 2015 or so, each time Ms. MacClelland visited the Verizon corporate-owned store in Eureka to change or update her wireless service plan, a Verizon salesperson utilized a proprietary sales process on an iPad. During this in-store process, Verizon represented the monthly price she would pay for the service, and Ms. MacClelland reasonably relied upon that representation. During this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. The monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge).

108. For many years, Ms. MacClelland has been signed up for electronic billing, as Verizon encouraged her to do. Each month, Ms. MacClelland receives an email notification from Verizon informing her that her monthly service bill is ready and stating only the total dollar amount of the bill. Ms. MacClelland then clicks on a link on the email to log into her My Verizon account to pay the bill. As alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF version of the bill are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's

monthly electronic billing process and monthly statements did not inform or adequately

disclose to Ms. MacClelland that Verizon was adding an Administrative Charge to her bill each

month or disclose the true nature or basis of the charge.

109.    Ms. MacClelland did not learn of the Administrative Charge's existence until it

was brought to her attention by her counsel in August 2021.

110.    When Ms. MacClelland agreed to purchase her Verizon service plans, she was

relying on Verizon's prominent representations, in each instance, regarding the monthly price

of the service plans. Ms. MacClelland did not expect (and she was never told) that Verizon

would actually charge her a so-called Administrative Charge on top of the advertised service

plan price or that the true price of the services would include an additional Administrative

Charge for each phone line which Verizon could and would increase at its desire. That

information would have been material to her. Had she known that information she would not

have been willing to pay as much for her plans and would have acted differently.

111.    Ms. MacClelland has a legal right to rely now, and in the future, on the

truthfulness and accuracy of Verizon's representations and advertisements regarding its

wireless service plan prices. Ms. MacClelland believes that she was given the services Verizon

promised her—just not at the price Verizon promised and advertised to her.

112.    Ms. MacClelland remains a Verizon postpaid wireless customer as of this filing.

Ms. MacClelland does not have feasible options other than Verizon for good wireless service

coverage in her geographic area in Eureka, California. Ms. MacClelland desires to sign up for

different Verizon postpaid wireless service plans and Verizon device installment plans in the

future. However, Ms. MacClelland wants to be confident that the advertised and quoted price

for Verizon's service plans is the true and full price for the services (i.e., that it includes all

applicable discretionary monthly service charges such as the Administrative Charge). And, if

Verizon introduces any new or invented discretionary monthly service charge (like it did with

the Administrative Charge), Ms. MacClelland wants to be confident that Verizon will include

the amount of that service charge in the advertised and quoted service plan price.

Ms. MacClelland will be harmed if, in the future, she is left to guess as to whether Verizon's

representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Karen Umberger**

113.    Plaintiff Karen Umberger is, and at all relevant times has been, a citizen and resident of Eureka, California.

114.    Ms. Umberger has been a continuous Verizon postpaid wireless customer since at least 2007. She initially signed up on or around 2007 for Verizon postpaid wireless service for at least two phone lines in a Verizon store located in Fortuna, California. She signed up for two-year service contracts for the phone lines. She also purchased new phones for each line along with the service contracts, as part of a bundle.

115.    When Ms. Umberger purchased her wireless service plan for the phone lines, Verizon prominently advertised and quoted, to Ms. Umberger and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Umberger, at any time before or when she signed up, that Verizon would charge her the Administrative Charge on top of the advertised and promised monthly price.

116.    Verizon charged Ms. Umberger an Administrative Charge beginning on her very first bill. Ms. Umberger did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

117.    Verizon has continued to charge Ms. Umberger an Administrative Charge every month from 2007 through the present.

118.    During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Umberger several times. Until December 2015, the Administrative Charge remained under a dollar per month per line. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

119.    Through its imposition of the Administrative Charge, Verizon has for 14 years

charged Ms. Umberger a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

120. Since 2007, Ms. Umberger has changed her Verizon plan a few times. Ms. Umberger has also purchased several mobile phones over the years from Verizon, typically one for each phone line every couple of years. Prior to 2014, Ms. Umberger would commit to 2-year service contracts to Verizon each time she purchased a mobile phone. On or after 2014, Ms. Umberger typically purchased new phones from Verizon on 24-payment device installment plans. For most of this period, Ms. Umberger has had multiple phone lines on each of her Verizon service plans. More recently, since approximately 2016, Ms. Umberger has had a single phone line with Verizon.

121. Nearly every time since 2007 that Ms. Umberger changed her wireless service plan or purchased a new mobile phone, she did so in person at the Verizon corporate-owned store located in Eureka, California. The only exception that she can recall was in 2021 when she purchased a new phone and changed her service plan over the phone with a Verizon telephone agent.

122. Each and every time that Ms. Umberger changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Umberger and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge, which Verizon charged on each of her lines). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Umberger purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to her.

123. In particular, since approximately 2015 or so, each time Ms. Umberger visited the Verizon store in Eureka to change or update her wireless service plan, a Verizon salesperson utilized a proprietary sales process on an iPad. During this in-store process, Verizon represented the monthly price she would pay for the service, and Ms. Umberger

reasonably relied upon that representation. During this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. The monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge).

124.    Ms. Umberger has been signed up for electronic billing and Auto Pay for at least the past ten years, as Verizon encouraged her to do. Through this billing process, Ms. Umberger receives a monthly Verizon billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Umberger that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

125.    Ms. Umberger did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in August 2021.

126.    In or around late September 2021, Ms. Umberger's iPhone 8 stopped working correctly and she called Verizon to purchase a new mobile phone. The telephone agent she spoke to sold her a new iPhone on a 24-month installment plan, and told Ms. Umberger that she also needed to change her service plan to one of Verizon's new "Unlimited" plans, which Ms. Umberger did. The telephone agent never disclosed the Administrative Charge, and the monthly price for the "Unlimited" plan that the agent quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount Ms. Umberger would be charged each month (inclusive of the Administrative Charge) under the new service plan. If Ms. Umberger were to cancel her Verizon wireless service before the installment payments for the new iPhone are complete, she would have to pay the full remaining balance immediately in a single balloon payment.

127.    When Ms. Umberger agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Umberger did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

128.    Ms. Umberger has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Umberger believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

129.    Ms. Umberger remains a Verizon postpaid wireless customer as of this filing. Ms. Umberger does not have feasible options other than Verizon for good wireless service coverage in her geographic area in Eureka, California. Ms. Umberger desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Umberger wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Umberger wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Umberger will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Scott Willits**

130.    Plaintiff Scott Willits is, and at all relevant times has been, a citizen and resident of Eureka, California.

131.     Mr. Willits has been a continuous Verizon postpaid wireless customer for over 9 years. On or around 2012, Mr. Willits first signed up with Verizon for a postpaid wireless service plan for three phone lines at the Verizon kiosk at his local Costco store. When he signed up, he agreed to a two-year service contract. He also purchased two new phones—one for him and one for his wife—along with the service contract, as part of a bundle.

132.     To sign up for the service plan and the three phone lines, Mr. Willits completed a Verizon-created process at the Costco store. When Mr. Willits purchased the wireless service plan, Verizon prominently advertised and quoted, to Mr. Willits and the public, that the plan would cost a particular monthly price. During this Verizon-created process at the Costco store, Verizon represented the monthly price he would pay for the service, and Mr. Willits reasonably relied upon that representation. During this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. The monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total monthly price would or might increase as a result of increases to the Administrative Charge.

133.     Mr. Willits's first Verizon bill included an Administrative Charge for each of his three phone lines. Verizon has continued to charge Mr. Willits an Administrative Charge each month for all three phone lines from 2012 to the present. Initially, the Administrative Charge for each phone line was less than a dollar per line per month. However, in December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month (totaling $3.69 a month for all three phone lines). In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month (totaling $5.34 a month for all three phone lines). In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month (totaling $5.85 a month for all three phone lines), which is the current amount as of this filing.

134.     Through its imposition of the Administrative Charge, Verizon has for 9 years charged Mr. Willits a higher price for his service plans each month than Verizon advertised and that he was promised and expected to pay.

135.    In 2014, Mr. Willits went back to the Verizon kiosk at his local Costco to purchase two new Samsung Galaxy S5 phones and to update his service plan. When he purchased the phones and updated his plan, he agreed to a two-year service contract for each phone. Again, when Mr. Willits purchased the wireless service plan pursuant to a Verizon-created process at the Costco store, Verizon prominently advertised and quoted, to Mr. Willits and the public, that the plan would cost a particular monthly price. Again, during this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. Again, the monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Again, Verizon did not disclose that the total monthly price would or might increase as a result of increases to the Administrative Charge—and in fact Verizon did increase the Administrative Charge in the middle of his supposedly fixed-rate contract, in December 2015, from $0.95 to $1.23 per month per line.

136.    In 2016, Mr. Willits went back to the Verizon kiosk at his local Costco to purchase a new phone and to update his Verizon service plan. Mr. Willits purchased a new Samsung Galaxy S7 on a 24-payment device installment plan. Again, when Mr. Willits updated his wireless service plan pursuant to a Verizon-created process at the Costco store, Verizon prominently advertised and quoted, to Mr. Willits and the public, that the plan would cost a particular monthly price. Again, during this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. Again, the monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge).

137.    Mr. Willits has been signed up for electronic billing and Auto Pay for at least the past four years, as Verizon encouraged him to do. Through this billing process, Mr. Willits receives a monthly Verizon billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process,

and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Willits that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

138.    Mr. Willits did not learn of the Administrative Charge's existence until it was brought to his attention by his counsel in August 2021.

139.    When Mr. Willits agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Willits did not expect (and he was never told) that Verizon would actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

140.    Mr. Willits has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Willits believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

141.    Mr. Willits remains a Verizon postpaid wireless customer as of this filing. Mr. Willits does not have feasible options other than Verizon for good wireless service coverage in his geographic area in Eureka, California. Mr. Willits desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Willits wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Willits wants to be confident that Verizon will include the

amount of that service charge in the advertised and quoted service plan price. Mr. Willits will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff Michael Branom**

142.    Plaintiff Michael Branom is a citizen and resident of Pasadena, California.

143.    Mr. Branom has been a continuous Verizon postpaid wireless customer since 2015, when he purchased a phone and signed up for one line of postpaid service in a Verizon corporate-owned store in Tempe, Arizona.

144.    When Mr. Branom purchased the phone and wireless service plan, Verizon prominently advertised and quoted, to Mr. Branom and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Mr. Branom, at any time before or when he signed up, that Verizon would charge him the Administrative Charge on top of the advertised and promised monthly price.

145.    Verizon charged Mr. Branom an Administrative Charge beginning on his very first bill. Mr. Branom did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

146.    Verizon has continued to charge Mr. Branom an Administrative Charge every month from 2015 through the present.

147.    During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Branom several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

148.    Through its imposition of the Administrative Charge, Verizon has for 7 years charged Mr. Branom a higher price for his service plans each month than Verizon advertised

and that he was promised and expected to pay.

149.    Mr. Branom has changed his Verizon plan once. On or around April 2018, Mr. Branom visited a Verizon corporate-owned store in Pasadena, California, where he changed his wireless plan and added a second postpaid line for his wife. At that time Mr. Branom also purchased new phones for himself and his wife. Mr. Branom entered into a 24-payment device installment plan for each of the two phones. While at the Pasadena Verizon store, a Verizon salesperson utilized a proprietary sales process on an iPad. During this in-store process, Verizon represented the monthly price he would pay for the service, and Mr. Branom reasonably relied upon that representation. During this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. The monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Similarly, when Mr. Branom purchased the two new mobile phones during that April 2018 Verizon store visit, at no point before or during the process was the Administrative Charge disclosed to him.

150.    Mr. Branom has been signed up for electronic billing and Auto Pay for the past few years, as Verizon encouraged him to do. Through this billing process, Mr. Branom receives a monthly Verizon text message which states his bill total and informs him that his bill will be automatically paid by the payment due date because he has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Branom that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

151.    Mr. Branom did not learn of the Administrative Charge's existence until it was brought to his attention by his counsel in December 2021.

152.    When Mr. Branom agreed to purchase his Verizon service plans, he was relying

on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Branom did not expect (and he was never told) that Verizon would actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

153.    Mr. Branom has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Branom believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

154.    Mr. Branom remains a Verizon postpaid wireless customer as of this filing. Mr. Branom desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Branom wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Branom wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Branom will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff Molly Brown**

155.    Plaintiff Molly Brown is, and at all relevant times has been, a citizen and resident of Novato, California.

156.    Ms. Brown has been a continuous Verizon postpaid wireless customer since at least 2014. She initially signed up for Verizon postpaid wireless service for one line in a Verizon corporate-owned store located in Novato, California, and she purchased a new phone

from Verizon at the same time.

157.    When Ms. Brown purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Brown and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Brown, at any time before or when she signed up, that Verizon would charge her the Administrative Charge on top of the advertised and promised monthly price.

158.    Verizon charged Ms. Brown an Administrative Charge beginning on her first bill. Ms. Brown did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

159.    Verizon has continued to charge Ms. Brown an Administrative Charge every month from her first bill through the present.

160.    During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Brown several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

161.    Through its imposition of the Administrative Charge, Verizon has for 7 years charged Ms. Brown a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

162.    Ms. Brown has changed her Verizon service plan a few times over the years, including to add three more lines for her two children and her husband. Ms. Brown has also purchased several mobile phones over the years from Verizon. Each time Ms. Brown purchased a new phone from Verizon, she entered into a 24-payment device installment plan for the device. Currently, Ms. Brown is on a 24-payment device installment plan for her iPhone 12.

163.    Most times since 2014 that Ms. Brown changed her wireless service plan or purchased a new mobile phone, she did so in person at the Verizon corporate-owned store

located in Novato, California. However, in 2019, Ms. Brown went to the Verizon kiosk at her local Target to purchase new phones for her children. And in 2020, Ms. Brown visited Verizon's website to purchase her iPhone 12.

164.     Each and every time that Ms. Brown changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Brown and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Brown did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Brown purchased a new mobile phone from Verizon or Target, at no point before or during the process was the Administrative Charge disclosed to her.

165.     Ms. Brown has been signed up for electronic billing and Auto Pay for the past few years, as Verizon encouraged her to do. Through this billing process, Ms. Brown receives a monthly Verizon billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Brown that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

166.     Ms. Brown did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in December 2021.

167.     When Ms. Brown agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Brown did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that

the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

168.    Ms. Brown has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Brown believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

169.    Ms. Brown remains a Verizon postpaid wireless customer as of this filing. Ms. Brown desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Brown wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Brown wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Brown will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Michael Carney**

170.    Plaintiff Michael Carney is a citizen and resident of Los Angeles, California.

171.    Mr. Carney has been a continuous Verizon postpaid wireless customer since 2011, when he signed up for three lines of postpaid service over the telephone with a Verizon telephone sales agent after reviewing service plan advertisements on the Verizon website.

172.    When Mr. Carney purchased the wireless service plan, Verizon prominently advertised and quoted, to Mr. Carney and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Mr. Carney, at any time before or when he signed up, that Verizon would charge him the Administrative Charge on top of the advertised and

promised monthly price.

173.     Verizon charged Mr. Carney an Administrative Charge beginning on his very first bill. Mr. Carney did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

174.     Verizon has continued to charge Mr. Carney an Administrative Charge every month from 2011 through the present.

175.     During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Carney several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

176.     Through its imposition of the Administrative Charge, Verizon has for over 10 years charged Mr. Carney a higher price for his service plans each month than Verizon advertised and that he was promised and expected to pay.

177.     Mr. Carney has changed his Verizon plan at least once. In or around February 2017, Mr. Carney called Verizon customer service and switched to his current "Unlimited" plan. When Mr. Carney changed his plan, Verizon represented the monthly price he would pay for the service, and Mr. Carney reasonably relied upon that representation. During this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. The monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge).

178.     Since February 2017, Mr. Carney has added more lines to his account, which currently total 9 phone lines. Each time a phone line was added, Verizon never disclosed the existence or amount of the Administrative Charge. Over the years, Mr. Carney has purchased, or a family member or friend on his account has instigated the purchase (which Mr. Carney has

authorized) of numerous new mobile phones directly from Verizon at corporate Verizon-owned stores or by calling Verizon customer service, or from third-party retailers such as the Apple Store. For example, Mr. Carney purchased his current mobile phone in December 2020 from the Apple Store. For each mobile phone that was purchased, Mr. Carney entered into a 24-month installment payment plan for the device. Each time a new mobile phone was purchased, at no point before or during the process was the Administrative Charge disclosed to him or to any family member or friend on his account who instigated a particular device purchase.

179.    Mr. Carney has been signed up for electronic billing for many years, as Verizon encouraged him to do. Through this billing process, Mr. Carney receives a monthly Verizon text message which states his bill total and the date it is due. Mr. Carney then logs into his My Verizon account via his computer and pays his monthly bill on the Verizon website. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge.

180.    Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Carney that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

181.    Mr. Carney learned of the Administrative Charge's existence several years ago. When he questioned a Verizon Wireless customer service agent about the charge, the Verizon representative told him that it was a fee that Verizon had to charge and that it could not be waived. Based on the location of the Administrative Charge on the full PDF bill he examined, and the statements made by the Version representative, Mr. Carney believed that the Administrative Charge was a pass-through cost that Verizon was required to charge. As described in detail above, the first page of the bill falsely states that "Surcharges" (which is how Verizon labels the Administrative Charge) are to "cover the costs that are billed to us by federal, state or local governments."

182.    When Mr. Carney agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the

service plans. Mr. Carney did not expect (and he was never told) that Verizon would actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

183.    Mr. Carney has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Carney believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

184.    Mr. Carney remains a Verizon postpaid wireless customer as of this filing. Mr. Carney desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Carney wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Carney wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Carney will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff Tim Frasch**

185.    Plaintiff Tim Frasch is a citizen and resident of Gilroy, California.

186.    Mr. Frasch has had one postpaid phone line with Verizon for more than 25 years.

187.    When Mr. Frasch purchased the wireless service plan for his phone line, Verizon prominently advertised and quoted, to Mr. Frasch and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Mr. Frasch, at any time before or when he

signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

188.    Verizon has charged Mr. Frasch an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills in September 2005. Mr. Frasch did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

189.    Verizon has continued to charge Mr. Frasch an Administrative Charge every month from September 2005 through the present.

190.    During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Frasch several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

191.    Through its imposition of the Administrative Charge, Verizon has for 17 years charged Mr. Frasch a higher price for his service plans each month than Verizon advertised and that he was promised and expected to pay.

192.    Mr. Frasch has changed his Verizon plan at least once. When Mr. Frasch last changed his Verizon plan, he visited a Verizon corporate-owned store in Gilroy, California. Mr. Frasch has also purchased several mobile phones over the years from Verizon. Mr. Frasch's most recent phone purchase was around 2017 at the Verizon store in Gilroy. Mr. Frasch entered into a 24-payment device installment plan contract to purchase the phone.

193.    Each time that Mr. Frasch changed his wireless service plan, Verizon prominently advertised and quoted, to Mr. Frasch and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Mr. Frasch did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative

Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Mr. Frasch purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to him.

194.    Mr. Frasch most recently changed his wireless service plan on or around 2015 at the Verizon store in Gilroy. A Verizon salesperson at the store utilized a proprietary sales process on an iPad to change and update his service plan. During this in-store process, Verizon represented the monthly price he would pay for the service, and Mr. Frasch reasonably relied upon that representation. During this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. The monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge).

195.    Mr. Frasch has been signed up for electronic billing and Auto Pay for the past few years, as Verizon encouraged him to do. Through this billing process, Mr. Frasch receives a monthly Verizon billing email and a text message which states his bill total and informs him that his bill will be automatically paid by the payment due date because he has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge.

196.    Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Frasch that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

197.    Mr. Frasch did not learn of the Administrative Charge's existence until it was brought to his attention by his counsel in December 2021.

198.    When Mr. Frasch agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Frasch did not expect (and he was never told) that Verizon would actually

charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

199. Mr. Frasch has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Frasch believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

200. Mr. Frasch remains a Verizon postpaid wireless customer as of this filing. Mr. Frasch desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Frasch wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Frasch wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Frasch will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff Patricia Gagan**

201. Plaintiff Patricia Gagan is, and at all relevant times has been, a citizen and resident of Los Angeles, California.

202. Ms. Gagan has been a continuous Verizon post-paid wireless customer since at least 2011. She initially signed up for Verizon post-paid wireless service in a Verizon corporate-owned store located in Los Angeles, California. She signed up for a two-year service contract for one line. She also purchased a new phone along with the service contract, as part of a bundle.

203.     When Ms. Gagan purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Gagan and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Gagan, at any time before or when she signed up, that Verizon would charge her the Administrative Charge on top of the advertised and promised monthly price.

204.     Verizon charged Ms. Gagan an Administrative Charge beginning on her first bill. Ms. Gagan did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

205.     Verizon has continued to charge Ms. Gagan an Administrative Charge every month since she first signed up for service through the present.

206.     During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Gagan several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

207.     Through its imposition of the Administrative Charge, Verizon has for over 10 years charged Ms. Gagan a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

208.     Ms. Gagan has changed her Verizon service plan a few times, including changing her plan to Verizon's "Start Unlimited" plan around a year ago. Each and every time that Ms. Gagan changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Gagan and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Gagan did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge.

209. On November 21, 2021, visited Victra, a Verizon-authorized retailer in Los Angeles, California, to add an iPad cellular-ready device to her wireless plan. At no point during the process was the Administrative Charge or its amount disclosed to her.

210. Over the years, Ms. Gagan has purchased mobile phones for use on her Verizon plan directly from Verizon, from a Verizon-authorized retailer, or from an Apple retail store or the Apple.com website. Each time that Ms. Gagan purchased a mobile phone, at no point before or during the process was the Administrative Charge disclosed to her.

211. Ms. Gagan has been signed up for electronic billing and Auto Pay for many years, as Verizon encouraged her to do. Through this billing process, Ms. Gagan receives a monthly text message from Verizon which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge.

212. Verizon's monthly electronic billing process and monthly statements did not adequately inform Ms. Gagan of the true nature or basis of the Administrative Charge.

213. Ms. Gagan did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in November 2021.

214. When Ms. Gagan agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Gagan did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

215. Ms. Gagan has a legal right to rely now, and in the future, on the truthfulness

and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Gagan believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

216. Ms. Gagan remains a Verizon post-paid wireless customer as of this filing. Ms. Gagan desires to remain a customer of Verizon and to have the option of purchasing different Verizon post-paid wireless service plans and Verizon device installment plans in the future. However, Ms. Gagan wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Gagan wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Gagan will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Anna Gutierrez**

217. Plaintiff Anna Gutierrez is, and at all relevant times has been, a citizen and resident of Whittier, California.

218. Ms. Gutierrez has been a continuous Verizon postpaid wireless customer for over 20 years. She initially signed up for Verizon postpaid wireless service while with her husband in a Verizon corporate-owned store located in Whittier, California. She signed up for two-year service contracts for two lines—one for herself and one for her husband. She also purchased two new phones along with the service contracts, as part of a bundle. Ms. Gutierrez has always been the person who managed and made payments on the Verizon account.

219. When Ms. Gutierrez purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Gutierrez and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Gutierrez, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised

and promised monthly price.

220.     Verizon has charged Ms. Gutierrez an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Gutierrez did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

221.     Verizon has continued to charge Ms. Gutierrez an Administrative Charge every month from September 2005 through the present.

222.     During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Gutierrez several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

223.     Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Gutierrez a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

224.     Ms. Gutierrez has changed her Verizon service plan a few times, including adding two lines for her children around 2015 and one line for her mother-in-law in 2020. Ms. Gutierrez has also purchased several mobile phones over the years from Verizon, typically replacing the mobile phones with new ones every two years. Prior to 2014, Ms. Gutierrez would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. On or after 2014, Ms. Gutierrez typically purchased new phones from Verizon on 24-payment device installment plans.

225.     Most times that Ms. Gutierrez changed her wireless service plan or purchased a new mobile phone, she did so in person at the Verizon corporate-owned store located in Whittier, California. However, she made her most recent phone purchases at her local Best Buy.

226. In September 2021, Ms. Gutierrez purchased three phones at her local Best Buy. Ms. Gutierrez purchased the three phones on 24-payment device installment plans with Verizon where the installment payments would be added to her monthly Verizon bill. At no point before or during the Verizon-created process for adding the new phones to her account was the Administrative Charge disclosed to her.

227. Each and every time that Ms. Gutierrez changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Gutierrez and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Gutierrez did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Gutierrez purchased a new mobile phone from Verizon or from Best Buy, at no point before or during the process was the Administrative Charge disclosed to her.

228. Ms. Gutierrez has been signed up for electronic billing and Auto Pay for the past two years, as Verizon encouraged her to do. Through this billing process, Ms. Gutierrez receives a monthly Verizon billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge.

229. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Gutierrez that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

230. Ms. Gutierrez learned of the Administrative Charge's existence several years ago. When she first noticed the Administrative Charge on her bill, she visited Verizon's website and started a chat with a Verizon customer support representative to ask about the Administrative Charge. The Verizon representative told her that it was a fee that Verizon had to

charge and that it could not be waived. Based on the location of the Administrative Charge on the bill she examined, and the statements made by the Version representative, Ms. Gutierrez believed that the Administrative Charge was a pass-through cost that Verizon was required to charge, like a tax. As described in detail above, on the first page of the bill Verizon falsely states that "Surcharges" (which is how Verizon labels the Administrative Charge) are to "cover the costs that are billed to us by federal, state or local governments."

231. When Ms. Gutierrez agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Gutierrez did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

232. Ms. Gutierrez has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Gutierrez believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

233. Ms. Gutierrez remains a Verizon postpaid wireless customer as of this filing. Ms. Gutierrez desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Gutierrez wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Gutierrez wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Gutierrez will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts

regarding the wireless service plans being advertised and represented to her.

**Plaintiff Linda Jenkins**

234.    Plaintiff Linda Jenkins is, and at all relevant times has been, a citizen and resident of Valencia, California.

235.    Ms. Jenkins has been a continuous Verizon postpaid wireless customer for over 20 years. She initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store located in Valencia, California, at which time her husband transferred his Verizon account and his phone to her.

236.    When Ms. Jenkins initially signed up for the wireless service plan, Verizon prominently advertised and quoted, to Ms. Jenkins and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Jenkins, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

237.    Verizon has charged Ms. Jenkins an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Jenkins did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

238.    Verizon has continued to charge Ms. Jenkins an Administrative Charge every month from September 2005 through the present.

239.    During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Jenkins several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

240.    Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Jenkins a higher price for her service plans each month than Verizon advertised

and that she was promised and expected to pay.

241. Ms. Jenkins has changed her Verizon service plan several times, including adding three lines for her daughter and her parents around four years ago. Ms. Jenkins has also purchased many mobile phones over the years directly from Verizon or from third-party stores. For the past 10 years, Ms. Jenkins has typically purchased her new phones either at the Verizon kiosk at her local Costco or at her local Best Buy. Prior to 2014, Ms. Jenkins would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. On or after 2014, Ms. Jenkins typically purchased new phones on 24-payment device installment plans which would be charged to her Verizon bill. Ms. Jenkins is currently on a 24-payment device installment plan for her iPhone 12.

242. Each and every time that Ms. Jenkins changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Jenkins and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Jenkins did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Jenkins purchased a new mobile phone from Verizon (either at a Verizon corporate-owned store or at a third-party retailer), at no point before or during the Verizon-created process was the Administrative Charge disclosed to her.

243. Ms. Jenkins has been signed up for electronic billing and Auto Pay for many years, as Verizon encouraged her to do. Through this billing process, Ms. Jenkins receives a monthly Verizon text message which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge.

244. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Jenkins that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

245. Ms. Jenkins first learned of the Administrative Charge's existence several years ago. Based on Verizon's presentation of the so-called "Surcharge" on the bill she examined, Ms. Jenkins believed that the Administrative Charge was a government pass-through cost that Verizon was required to charge, like a tax. As described in detail above, Verizon falsely states on the first page of the bill that "Surcharges" (which is how Verizon labels the Administrative Charge) are to "cover the costs that are billed to us by federal, state or local governments."

246. When Ms. Jenkins agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Jenkins did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

247. Ms. Jenkins has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Jenkins believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

248. Ms. Jenkins remains a Verizon postpaid wireless customer as of this filing. Ms. Jenkins desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Jenkins wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Jenkins wants to be confident

that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Jenkins will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Augustus Johnson**

249.    Plaintiff Augustus Johnson is a citizen and resident of Eureka, California.

250.    Mr. Johnson has been a continuous Verizon postpaid wireless customer since 2016, when he signed up for one line of postpaid service in a Verizon corporate-owned store in Portland, Oregon.

251.    When Mr. Johnson purchased the wireless service plan, Verizon prominently advertised and quoted, to Mr. Johnson and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Mr. Johnson, at any time before or when he signed up, that Verizon would charge him the Administrative Charge on top of the advertised and promised monthly price.

252.    Verizon charged Mr. Johnson an Administrative Charge beginning on his very first bill. Mr. Johnson did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

253.    Verizon has continued to charge Mr. Johnson an Administrative Charge every month from 2016 through the present.

254.    During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Johnson twice. In August 2019, Verizon raised the Administrative Charge from $1.23 to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

255.    Through its imposition of the Administrative Charge, Verizon has for 6 years charged Mr. Johnson a higher price for his service plan each month than Verizon advertised and that he was promised and expected to pay.

256.    Each time Mr. Johnson has changed his Verizon plan since he moved back to

California in 2016, he has done so at the Verizon corporate-owned store in Eureka, California or on the Verizon website. Each time Mr. Johnson visited the Verizon store in Eureka to change or update his wireless service plan, a Verizon salesperson utilized a proprietary sales process on an iPad. During this in-store process, Verizon represented the monthly price he would pay for the service, and Mr. Johnson reasonably relied upon that representation. During this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. The monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Likewise, when Mr. Johnson updated his wireless plan via the Verizon website, Verizon never disclosed the existence or amount of the Administrative Charge.

257. Mr. Johnson has also purchased several mobile phones over the years from Verizon, usually replacing his phone every two years. Mr. Johnson typically purchased the new phones through Verizon's website, although sometimes he completed the transaction by then speaking on the phone with Verizon customer service. Mr. Johnson always entered into a 24-payment device installment plan to pay for the phones. Mr. Johnson is currently on a 24-payment device installment plan for his iPhone 11. Each time that Mr. Johnson purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to him.

258. Mr. Johnson has been signed up for Auto Pay for several years, and has been signed up for paperless billing for at least a year, as Verizon encouraged him to do. Through this billing process, Mr. Johnson receives a monthly Verizon billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, the abridged paper version of the bill, and the full online PDF monthly billing statements are deliberately designed in a manner to omit, hide and/or disguise the Administrative Charge.

259. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Johnson that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

260. Mr. Johnson first learned of the Administrative Charge's existence in 2018. Based on the location of the Administrative Charge on the bill he examined, Mr. Johnson believed that the Administrative Charge was a government pass-through cost that Verizon was required to charge, like a tax. As described in detail above, Verizon falsely states on the first page of the bill that "Surcharges" (which is how Verizon labels the Administrative Charge) are to "cover the costs that are billed to us by federal, state or local governments."

261. When Mr. Johnson agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Johnson did not expect (and he was never told) that Verizon would actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

262. Mr. Johnson has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Johnson believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

263. Mr. Johnson remains a Verizon postpaid wireless customer as of this filing. Mr. Johnson desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Johnson wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Johnson wants to be confident

that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Johnson will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff William Kaupelis**

264. Plaintiff William Kaupelis is a citizen and resident of Placentia, California.

265. Mr. Kaupelis has been a continuous Verizon postpaid wireless customer since 2015, when he purchased a phone and signed up for one line of postpaid service in a Verizon corporate-owned store in Brea, California.

266. When Mr. Kaupelis purchased the phone and wireless service plan, Verizon prominently advertised and quoted, to Mr. Kaupelis and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Mr. Kaupelis, at any time before or when he signed up, that Verizon would charge him the Administrative Charge on top of the advertised and promised monthly price.

267. Verizon charged Mr. Kaupelis an Administrative Charge beginning on his very first bill. Mr. Kaupelis did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

268. Verizon has continued to charge Mr. Kaupelis an Administrative Charge every month from 2015 through the present.

269. During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Kaupelis several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

270. Through its imposition of the Administrative Charge, Verizon has for 7 years charged Mr. Kaupelis a higher price for his service plans each month than Verizon advertised

and that he was promised and expected to pay.

271.    Since 2015, Mr. Kaupelis has changed his Verizon plan a couple of times. Around 2017, Mr. Kaupelis called Verizon customer service to inquire about avoiding data overage costs, and the Verizon agent encouraged him to sign up for a more expensive "Unlimited" plan. The Verizon agent never disclosed the existence or amount of the Administrative Charge. The monthly price that the Verizon agent quoted him did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge).

272.    On or around May 2019, Mr. Kaupelis visited a Verizon corporate-owned store in Brea, California, and added a second postpaid line for his Apple Watch. When he added this second line, a Verizon salesperson utilized a proprietary sales process on an iPad. During this in-store process, Verizon represented the monthly price he would pay for the service, and Mr. Kaupelis reasonably relied upon that representation. During this process, Verizon never disclosed the existence of, let alone the amount of, the Administrative Charge. The monthly price that Verizon quoted and represented did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge).

273.    Mr. Kaupelis has also purchased several mobile phones over the years from Verizon. Each time Mr. Kaupelis purchased a new phone from Verizon he entered into a 24-payment device installment plan. Each time that Mr. Kaupelis purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to him.

274.    Mr. Kaupelis has been signed up for electronic billing and Auto Pay for the past few years, as Verizon encouraged him to do. Through this billing process, Mr. Kaupelis receives a monthly Verizon billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process,

and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge.

275. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Kaupelis that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

276. Mr. Kaupelis did not learn of the Administrative Charge's existence until it was brought to his attention by his counsel in November 2021.

277. When Mr. Kaupelis agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Kaupelis did not expect (and he was never told) that Verizon would actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

278. Mr. Kaupelis has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Kaupelis believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

279. Mr. Kaupelis remains a Verizon postpaid wireless customer as of this filing. Mr. Kaupelis desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Kaupelis wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Kaupelis wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Kaupelis will be harmed if, in the future, he is left to guess as to whether

Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff Marilyn Kaye**

280.     Plaintiff Marilyn Kaye is, and at all relevant times has been, a citizen and resident of Chatsworth, California.

281.     Ms. Kaye has been a continuous Verizon postpaid wireless customer for over 20 years. She initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store located in Chatsworth, California. At that time, she signed up for two-year service contracts for two lines for herself and her husband. She also purchased two new phones along with the service contracts, as part of a bundle.

282.     When Ms. Kaye purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Kaye and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Kaye, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

283.     Verizon has charged Ms. Kaye an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Kaye did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

284.     Verizon has continued to charge Ms. Kaye an Administrative Charge every month from September 2005 through the present.

285.     During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Kaye several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

286. Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Kaye a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

287. Ms. Kaye has changed her Verizon service plan a few times over the years, including adding another line for her son around 2005 and changing her plan to one of Verizon's "Unlimited" plans around 2019. She typically changes her service plan over the phone with Verizon customer service. Each and every time that Ms. Kaye changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Kaye and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Kaye did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge.

288. Ms. Kaye has also purchased many mobile phones over the years from Verizon, typically once every couple of years. Ms. Kaye typically purchases the phones in-person from Verizon's corporate-owned store located in Northridge, California or over-the-phone by calling Verizon customer service. Prior to 2014, Ms. Kaye would commit to 2-year service contracts to Verizon each time she purchased a mobile phone. On or after 2014, Ms. Kaye typically purchased new phones from Verizon on 24-payment device installment plans. She is currently on a 24-payment device installment plan for her Galaxy A02. Each time Ms. Kaye purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to her.

289. Ms. Kaye has been signed up for electronic billing for many years and recently signed up for Auto Pay, as Verizon encouraged her to do. Through this billing process, Ms. Kaye receives a monthly Verizon billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center

and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Kaye that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

290. Ms. Kaye did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in November 2021.

291. When Ms. Kaye agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Kaye did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

292. Ms. Kaye has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Kaye believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

293. Ms. Kaye remains a Verizon postpaid wireless customer as of this filing. Ms. Kaye desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Kaye wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Kaye wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Kaye will be harmed if, in the future, she is left to guess as to whether Verizon's

representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Janette Lisner**

294. Plaintiff Janette Lisner is, and at all relevant times has been, a citizen and resident of Tarzana, California.

295. Ms. Lisner has been a continuous Verizon postpaid wireless customer for over 20 years. She initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store nearby her home in Tarzana, California. She signed up for a two-year service contract for one phone line. She also purchased a new phone along with the service contract, as part of a bundle.

296. When Ms. Lisner purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Lisner and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Lisner, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

297. Verizon has charged Ms. Lisner an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Lisner did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

298. Verizon has continued to charge Ms. Lisner an Administrative Charge every month from September 2005 through the present.

299. During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Lisner several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

300. Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Lisner a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

301. Ms. Lisner has changed her Verizon service plan a few times over the years. Ms. Lisner has also purchased several mobile phones over the years from Verizon.

302. Each and every time that Ms. Lisner changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Lisner and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Lisner did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Lisner purchased a new mobile phone directly from Verizon or at a third party retailer such as Best Buy, at no point before or during the process was the Administrative Charge disclosed to her.

303. Until September 2020, Ms. Lisner had always been enrolled in paper billing, and she paid her bill each month over the phone with Verizon via Verizon's interactive voice response system. As described in detail above, Verizon's paper bills do not contain a line item or a listed amount for the Administrative Charge. And the Administrative Charge was not disclosed to Ms. Lisner when she paid her bill over the phone each month.

304. In September 2020, Verizon unilaterally and automatically, without any request or action by Ms. Lisner, enrolled Ms. Lisner in electronic billing. Now, Ms. Lisner could only view her bills online through a My Verizon account; however, she was not able to figure out how to access her account online and she was thus now unable to access her monthly bills. Ms. Lisner would only receive an email notification from Verizon informing her that her monthly service bill was ready to be paid and stating the total dollar amount of the bill. Ms. Lisner would then call Verizon's interactive voice response system and pay her bill over the phone, as she had always done. (In December 2021, Ms. Lisner was finally able to access her My Verizon account via Verizon's smartphone app with the help of her attorneys.)

305.     Ms. Lisner did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in November 2021.

306.     When Ms. Lisner agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Lisner did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

307.     Ms. Lisner has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Lisner believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

308.     Ms. Lisner remains a Verizon postpaid wireless customer as of this filing. Ms. Lisner desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Lisner wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Lisner wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Lisner will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff William Eric Lough**

309.     Plaintiff William Eric Lough is a citizen and resident of Wildomar, California.

310.     Mr. Lough has been a continuous Verizon postpaid wireless customer for nearly

20 years. He initially signed up for one line of postpaid service in a Verizon corporate-owned store in Long Beach, California. He also purchased a new phone along with the service contract, as part of a bundle.

311.    When Mr. Lough purchased the phone and wireless service plan, Verizon prominently advertised and quoted, to Mr. Lough and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Mr. Lough, at any time before or when he signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

312.    Verizon has charged Mr. Lough an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Mr. Lough did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

313.    Verizon has continued to charge Mr. Lough an Administrative Charge every month from September 2005 through the present.

314.    During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Lough several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

315.    Through its imposition of the Administrative Charge, Verizon has for 17 years charged Mr. Lough a higher price for his service plan each month than Verizon advertised and that he was promised and expected to pay.

316.    Any time Mr. Lough has changed his service plan he visited a Verizon corporate-owned store in Wildomar, California. Mr. Lough has also purchased several mobile phones over the years from Verizon. Over the past 8 years, Mr. Lough has purchased his new Verizon phones from the Verizon kiosk at his local Costco, or at his local Best Buy store. Since

2014, Mr. Lough has typically entered into a 24-payment device installment plan for each new phone he has purchased, where the monthly installment payments were added to his Verizon bill.

317. Each and every time that Mr. Lough changed his wireless service plan, Verizon prominently advertised and quoted, to Mr. Lough and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Mr. Lough did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Mr. Lough purchased a new mobile phone (either at a Verizon corporate-owned store or at Costco or Best Buy) at no point before or during the Verizon-created process was the Administrative Charge disclosed to him.

318. Mr. Lough receives paper bills, but pays online. Each month, Mr. Lough receives a paper bill and a text message notification from Verizon informing him that his monthly service bill is ready. Mr. Lough then visits Verizon's website and logs into his My Verizon account to pay the bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, the abridged paper version of the bill, and the full online PDF monthly billing statements are deliberately designed in a manner to omit, hide and/or disguise the Administrative Charge.

319. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Lough that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

320. Mr. Lough first learned of the Administrative Charge's existence several years ago. When he first noticed the Administrative Charge on his bill, he believed that it was some sort of mandatory pass-through charge that could not be waived. As described in detail above, the first page of the bill falsely states that "Surcharges" (which is how Verizon labels the Administrative Charge) are to "cover the costs that are billed to us by federal, state or local governments."

321.	When Mr. Lough agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Lough did not expect (and he was never told) that Verizon would actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

322.	Mr. Lough has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Lough believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

323.	Mr. Lough remains a Verizon postpaid wireless customer as of this filing. Mr. Lough desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Lough wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Lough wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Lough will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff David Massaro**

324.	Plaintiff David Massaro is a citizen and resident of Yucaipa, California.

325.	Mr. Massaro has been a continuous Verizon postpaid wireless customer since 2004, when he signed up for postpaid service in a local Verizon corporate-owned store. He signed up for two-year service contracts for two lines for himself and his wife. He also

purchased two new phones along with the service contracts, as part of a bundle.

326. When Mr. Massaro purchased the phones and wireless service plan, Verizon prominently advertised and quoted, to Mr. Massaro and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Mr. Massaro, at any time before or when he signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

327. Verizon has charged Mr. Massaro an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Mr. Massaro did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

328. Verizon has continued to charge Mr. Massaro an Administrative Charge every month from September 2005 through the present.

329. During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Massaro several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

330. Through its imposition of the Administrative Charge, Verizon has for 17 years charged Mr. Massaro a higher price for his service plans each month than Verizon advertised and that he was promised and expected to pay.

331. Mr. Massaro has changed his Verizon plan over the years to add two more lines for his family. Each time Mr. Massaro added a new line, he would do so in-person at a Verizon corporate-owned store in Yucaipa, California, or over the phone with a Verizon customer service agent. Mr. Massaro has also purchased several mobile phones over the years from Verizon, either in-person at a Verizon store, on Verizon's website, or over the phone with a Verizon customer service agent. Nearly every time since 2014 that Mr. Massaro purchased a

new phone from Verizon he entered into a 24-payment device installment plan to pay for the device. Mr. Massaro is currently on three 24-payment device installment plans for two iPhone 11 phones and an iPhone 12 Pro phone.

332.    Each and every time that Mr. Massaro changed his wireless service plan, Verizon prominently advertised and quoted, to Mr. Massaro and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Mr. Massaro did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Mr. Massaro purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to him.

333.    Mr. Massaro has been signed up for electronic billing and Auto Pay for the past few years, as Verizon encouraged him to do. Through this billing process, Mr. Massaro receives a monthly Verizon billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Massaro that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

334.    Mr. Massaro did not learn of the Administrative Charge's existence until it was brought to his attention by his counsel in November 2021.

335.    When Mr. Massaro agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Massaro did not expect (and he was never told) that Verizon would actually

charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

336. Mr. Massaro has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Massaro believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

337. Mr. Massaro remains a Verizon postpaid wireless customer as of this filing. Mr. Massaro desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Massaro wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Massaro wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Massaro will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff Louise Monsour**

338. Plaintiff Louise Monsour is, and at all relevant times has been, a citizen and resident of Eureka, California.

339. Ms. Monsour has been a continuous Verizon postpaid wireless customer for over 20 years. She initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store near her home. She signed up for a two-year service contract for one line. She also purchased a new phone along with the service contract, as part of a bundle.

340. When Ms. Monsour purchased her wireless service plan, Verizon prominently

advertised and quoted, to Ms. Monsour and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Monsour, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

341. Verizon charged Ms. Monsour an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Monsour did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

342. Verizon has continued to charge Ms. Monsour an Administrative Charge every month from September 2005 through the present.

343. During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Monsour several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

344. Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Monsour a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

345. Ms. Monsour has changed her Verizon service plan over the years, including adding a second line (which she removed a couple of years ago). Whenever Ms. Monsour changed her service plan, she would either visit a Verizon corporate-owned store in California or call Verizon. Ms. Monsour has also purchased several mobile phones over the years from Verizon. Prior to 2014, Ms. Monsour would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. On or after 2014, Ms. Monsour typically purchased new phones from Verizon on 24-payment device installment plans where the payments were added to her monthly Verizon bill.

346.     Each and every time that Ms. Monsour changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Monsour and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Monsour did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Monsour purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to her.

347.     Ms. Monsour has been signed up for electronic billing and Auto Pay for the past few years, as Verizon encouraged her to do. Through this billing process, Ms. Monsour receives a monthly Verizon billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Monsour that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

348.     Ms. Monsour did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in November 2021.

349.     When Ms. Monsour agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Monsour did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information

would have been material to her. Had she known that information she would not have been

willing to pay as much for her plans and would have acted differently.

350. Ms. Monsour has a legal right to rely now, and in the future, on the truthfulness

and accuracy of Verizon's representations and advertisements regarding its wireless service

plan prices. Ms. Monsour believes that she was given the services Verizon promised her—just

not at the price Verizon promised and advertised to her.

351. Ms. Monsour remains a Verizon postpaid wireless customer as of this filing. Ms.

Monsour does not have feasible options other than Verizon for good wireless service coverage

in her geographic area in Eureka, California. Ms. Monsour desires to sign up for different

Verizon postpaid wireless service plans and Verizon device installment plans in the future.

However, Ms. Monsour wants to be confident that the advertised and quoted price for

Verizon's service plans is the true and full price for the services (i.e., that it includes all

applicable discretionary monthly service charges such as the Administrative Charge). And, if

Verizon introduces any new or invented discretionary monthly service charge (like it did with

the Administrative Charge), Ms. Monsour wants to be confident that Verizon will include the

amount of that service charge in the advertised and quoted service plan price. Ms. Monsour will

be harmed if, in the future, she is left to guess as to whether Verizon's representations are

accurate and whether there are omissions of material facts regarding the wireless service plans

being advertised and represented to her.

**Plaintiff Darleen Perez**

352. Plaintiff Darleen Perez is, and at all relevant times has been, a citizen and

resident of Long Beach, California.

353. Ms. Perez has been a continuous Verizon postpaid wireless customer since at

least 2004. She initially signed up for Verizon postpaid wireless service in a Verizon corporate-

owned store located near her home. She signed up for a two-year service contract for one line

of service. She also purchased a new phone along with the service contract, as part of a bundle.

354. When Ms. Perez purchased her wireless service plan, Verizon prominently

advertised and quoted, to Ms. Perez and the public, that the plan would cost a particular

monthly price. Verizon did not disclose to Ms. Perez, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

355. Verizon charged Ms. Perez an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Perez did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

356. Verizon has continued to charge Ms. Perez an Administrative Charge every month from September 2005 through the present.

357. During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Perez several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

358. Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Perez a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

359. Ms. Perez has changed her Verizon service plan a few times over the years, including adding a second line for her Apple Watch and changing her plan to Verizon's "Get More Unlimited 5G UW" plan in 2020. Ms. Perez has also purchased several mobile phones over the years from Verizon. Prior to 2014, Ms. Perez would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. On or after 2014, Ms. Perez typically purchased new phones from Verizon on 24-payment device installment plans. Ms. Perez is currently on a 24-payment device installment plan for her iPhone 12 Pro Max. Nearly every time since 2010 that Ms. Perez changed her wireless service plan or purchased a new mobile phone, she did so through Verizon's website.

360. Each and every time that Ms. Perez changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Perez and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and represented to Ms. Perez did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Perez purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to her.

361. For many years, Ms. Perez has been signed up for electronic billing, as Verizon encouraged her to do. Each month, Ms. Perez receives an email notification and a text message from Verizon informing her that her monthly service bill is ready and stating only the total dollar amount of the bill. Ms. Perez then uses the My Verizon smartphone app to log into her My Verizon account to pay the bill. As alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Perez that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

362. Ms. Perez did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in December 2021.

363. When Ms. Perez agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Perez did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as

much for her plans and would have acted differently.

364. Ms. Perez has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Perez believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

365. Ms. Perez remains a Verizon postpaid wireless customer as of this filing. Ms. Perez desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Perez wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Perez wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Perez will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Gabrielle Pozzuoli**

366. Plaintiff Gabrielle Pozzuoli is currently a citizen and resident of Woodland Hills, California.

367. Ms. Pozzuoli has been a continuous Verizon postpaid wireless customer since at least 2004. Ms. Pozzuoli initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store in California. At that time, Ms. Pozzuoli signed up for a two-year service contract for one wireless line. She also purchased a new phone along with the service contract, as part of a bundle. (When Ms. Pozzuoli first signed up, she did so under her previous name, Gabrielle Davis. This is still the name on her Verizon account.)

368. When Ms. Pozzuoli purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Pozzuoli and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Pozzuoli, at any time before or when she signed

up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

369. Verizon charged Ms. Pozzuoli an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Pozzuoli did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

370. Verizon has continued to charge Ms. Pozzuoli an Administrative Charge every month from September 2005 through the present.

371. During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Pozzuoli several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

372. Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Pozzuoli a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

373. Ms. Pozzuoli has changed her Verizon service plan several times over the years, including adding three more lines to her account. Most recently, on or around October 2021 Ms. Pozzuoli changed her service plan to Verizon's "Play More Unlimited 5G UW" plan when she purchased two new iPhone 13 phones at the Apple Store; Ms. Pozzuloli then had to complete the service plan change at a Verizon corporate-owned store due to some problem with the plan change in the Apple Store.

374. Ms. Pozzuoli has also purchased several mobile phones over the years directly from Verizon or from the Apple Store. Prior to 2014, Ms. Pozzuoli would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. On or after 2014, Ms. Pozzuoli typically purchased new phones for her Verizon account on device installment plans,

where the monthly installment payments were added to her Verizon bill. Mostly recently, when she purchased the two new iPhone 13 phones in October 2021, Ms. Pozzuoli entered into 30-payment device installment plans for each of the phones.

375.    Each and every time that Ms. Pozzuoli changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Pozzuoli and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Pozzuoli (including via the Verizon-created process utilized at the Apple Store) did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Pozzuoli purchased a new mobile phone from Verizon or from the Apple Store, at no point before or during the process was the Administrative Charge disclosed to her.

376.    Ms. Pozzuoli has been signed up for electronic billing and Auto Pay for the past few years, as Verizon encouraged her to do. Through this billing process, Ms. Pozzuoli receives a monthly Verizon billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Pozzuoli that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

377.    Ms. Pozzuoli did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in December 2021.

378.    When Ms. Pozzuoli agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Pozzuoli did not expect (and she was never told) that Verizon would

actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

379. Ms. Pozzuoli has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Pozzuoli believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

380. Ms. Pozzuoli remains a Verizon postpaid wireless customer as of this filing. Ms. Pozzuoli desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Pozzuoli wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Pozzuoli wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Pozzuoli will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Valerie Reed**

381. Plaintiff Valerie Reed is, and at all relevant times has been, a citizen and resident of Eureka, California.

382. Ms. Reed has been a continuous Verizon postpaid wireless customer since at least 2017. She initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store located in Eureka, California. When she signed up for service, she also purchased several mobile phones on 24-payment device installment plans. She currently has six lines of wireless service.

383.     When Ms. Reed purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Reed and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Reed, at any time before or when she signed up, that Verizon would charge her the Administrative Charge on top of the advertised and promised monthly price.

384.     Verizon charged Ms. Reed an Administrative Charge beginning on her first bill. Ms. Reed did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

385.     Verizon has continued to charge Ms. Reed an Administrative Charge every month from 2017 through the present.

386.     During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Reed at least twice. In August 2019, Verizon raised the Administrative Charge from $1.23 to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

387.     Through its imposition of the Administrative Charge, Verizon has for 5 years charged Ms. Reed a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

388.     Ms. Reed has changed her Verizon service plan several times over the years, including adding more lines for her family and changing her plan to Verizon's "Get More Unlimited" plan. Ms. Reed has also purchased several mobile phones directly from Verizon over the years. Ms. Reed typically purchased new phones from Verizon on 24-payment device installment plans. Ms. Reed is currently on three 24-payment device installment plans for her iPhone 12 Pro, iPhone 11 Pro Max, and iPhone SE 2020. Ms. Reed typically changed her wireless service plan and purchased new phones by calling Verizon customer service.

389.     Each and every time that Ms. Reed changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Reed and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that

Verizon quoted and stated to Ms. Reed did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Reed purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to her.

390. Ms. Reed has been signed up for electronic billing and Auto Pay for the past few years, as Verizon encouraged her to do. Through this billing process, Ms. Reed receives a monthly Verizon billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Reed that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

391. Ms. Reed did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in November 2021.

392. When Ms. Reed agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Reed did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

393. Ms. Reed has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan

prices. Ms. Reed believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

394.    Ms. Reed remains a Verizon postpaid wireless customer as of this filing. Ms. Reed does not have feasible options other than Verizon for good wireless service coverage in her geographic area in Eureka, California. Ms. Reed desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Reed wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Reed wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Reed will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Bruce Schramm**

395.    Plaintiff Bruce Schramm is a citizen and resident of Tarzana, California.

396.    Mr. Schramm has been a continuous Verizon postpaid wireless customer for over 19 years. On or around 2002, Mr. Schramm signed up for one line of Verizon postpaid service at a RadioShack store in California. He signed up for a service contract with Verizon that was at least one year in length. He also purchased a new phone along with the service contract, as part of a bundle.

397.    To sign up for the service plan, Mr. Schramm completed a Verizon-created process at the RadioShack store. When Mr. Schramm purchased the wireless service plan, Verizon prominently advertised and quoted, to Mr. Schramm and the public, that the plan would cost a particular monthly price. Mr. Schramm was not informed, at any time before or when he signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

398.    Verizon first began charging Mr. Schramm an Administrative Charge September 2005. Mr. Schramm did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

399.    Verizon has continued to charge Mr. Schramm an Administrative Charge every month from September 2005 through the present.

400.    During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Schramm several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

401.    Through its imposition of the Administrative Charge, Verizon has for 17 years charged Mr. Schramm a higher price for his service plans each month than Verizon advertised and that he was promised and expected to pay.

402.    Mr. Schramm has changed his Verizon plan a few times over the years, including adding three more lines for his family around 2011 (his daughter has since left his Verizon plan, so Mr. Schramm currently has a total of three lines of service). Every time Mr. Schramm changed his Verizon plan, he would do so at a Verizon corporate-owned store in California. Mr. Schramm has also purchased several mobile phones over the years from Verizon. From 2014 up until a few years ago, each time Mr. Schramm purchased a new phone from Verizon he entered into a 24-payment device installment plan to pay for the phone. However, a few years ago Verizon informed him that going forward, in order to sign up for Verizon's device installment plans he would have to switch his older service plan to a newer Verizon "Unlimited" plan—which he did not want to do. Thus, for the past few years, in order to keep his existing service plan, Mr. Schramm has paid upfront (without an installment plan) for all of his new phones at a Verizon corporate-owned store or at the Apple Store.

403.    Each and every time that Mr. Schramm changed his wireless service plan,

Verizon prominently advertised and quoted, to Mr. Schramm and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Mr. Schramm did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Mr. Schramm purchased a new mobile phone directly from Verizon or at the Apple Store, at no point before or during the process was the Administrative Charge disclosed to him.

404.    Mr. Schramm has been signed up for electronic billing and Auto Pay for at least the last year, as Verizon encouraged him to do. Through this billing process, Mr. Schramm receives a monthly Verizon text message which states his bill total and informs him that his bill will be automatically paid by the payment due date because he has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Schramm that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

405.    Mr. Schramm first learned of the Administrative Charge's existence several years ago. When he first noticed the Administrative Charge on his bill, he did not understand what it was for, but believed that it was a mandatory charge that could not be waived. As described in detail above, the first page of the bill falsely states that "Surcharges" (which is how Verizon labels the Administrative Charge) are to "cover the costs that are billed to us by federal, state or local governments."

406.    When Mr. Schramm agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Schramm did not expect (and he was never told) that Verizon would

actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

407.    Mr. Schramm has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Schramm believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

408.    Mr. Schramm remains a Verizon postpaid wireless customer as of this filing. Mr. Schramm desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. Schramm wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Schramm wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Schramm will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff Kerry Showalter**

409.    Plaintiff Kerry Showalter is a citizen and resident of Newbury Park, California.

410.    Mr. Showalter has been a continuous Verizon postpaid wireless customer since 2001, when he signed up for two lines of postpaid service in a Verizon corporate-owned store in California. He also purchased two new phones along with the service contracts, as part of a bundle.

411.    When Mr. Showalter purchased the wireless service plan, Verizon prominently advertised and quoted, to Mr. Showalter and the public, that the plan would cost a particular

monthly price. Verizon did not disclose to Mr. Showalter, at any time before or when he signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

412.     Verizon charged Mr. Showalter an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Mr. Showalter did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

413.     Verizon has continued to charge Mr. Showalter an Administrative Charge every month from September 2005 through the present.

414.     During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. Showalter several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

415.     Through its imposition of the Administrative Charge, Verizon has for 17 years charged Mr. Showalter a higher price for his service plans each month than Verizon advertised and that he was promised and expected to pay.

416.     Mr. Showalter has changed his Verizon plan several times over the years, including adding a third line for his son (the third line was removed around six years ago). Also, around 10 years ago, he put the Verizon account under his wife's name, Lisa Showalter so that they could enjoy an employer discount. However, Mr. Showalter has always been the person who managed and made payments on the Verizon account.

417.     Mr. Showalter has also purchased several mobile phones over the years directly from Verizon. Since 2014, when Mr. Showalter purchased a new phone from Verizon he typically entered into a 24-payment device installment plan. Recently, Mr. Showalter has purchased several new phones by paying upfront (without a device installment plan) from

third-party vendors including on Amazon.com.

418. Each and every time that Mr. Showalter changed his wireless service plan, Verizon prominently advertised and quoted, to Mr. Showalter and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Mr. Showalter did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Mr. Showalter purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to him.

419. Mr. Showalter has always been enrolled in paper billing, and he pays his bills by logging into his My Verizon account online. As described in detail above, Verizon's paper bills do not contain a line item or a listed amount for the Administrative Charge. And, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. Showalter that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

420. Mr. Showalter does not recall learning of the Administrative Charge's existence until it was brought to his attention by his counsel in November 2021.

421. When Mr. Showalter agreed to purchase his Verizon service plans, he was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. Showalter did not expect (and he was never told) that Verizon would actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been

willing to pay as much for his plans and would have acted differently.

422.    Mr. Showalter has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. Showalter believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

423.    Mr. Showalter remains a Verizon postpaid wireless customer as of this filing. Mr. Showalter desires to sign up for different Verizon postpaid wireless service plans in the future. However, Mr. Showalter wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. Showalter wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. Showalter will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff John St.Jarre**

424.    Plaintiff John St.Jarre is a citizen and resident of Wildomar, California.

425.    Mr. St.Jarre has been a continuous Verizon postpaid wireless customer for over 20 years. He initially signed up for Verizon postpaid service in a Verizon corporate-owned store in California. He signed up for a two-year service contract for one line. He also purchased a new phone along with the service contract, as part of a bundle.

426.    When Mr. St.Jarre purchased the phone and wireless service plan, Verizon prominently advertised and quoted, to Mr. St.Jarre and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Mr. St.Jarre, at any time before or when he signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

427.    Verizon charged Mr. St.Jarre an Administrative Charge since Verizon first

began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Mr. St.Jarre did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

428.    Verizon has continued to charge Mr. St.Jarre an Administrative Charge every month from September 2005 through the present.

429.    During that time, Verizon has increased the amount of the Administrative Charge charged to Mr. St.Jarre several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon increased the Administrative Charge to $1.95 per line each month, which is the current amount as of this filing.

430.    Through its imposition of the Administrative Charge, Verizon has for 17 years charged Mr. St.Jarre a higher price for his service plans each month than Verizon advertised and that he was promised and expected to pay.

431.    Mr. St.Jarre has changed his Verizon service plan a few times over the years, including changing his plan to Verizon's "Go Unlimited" plan around 2017. Mr. St.Jarre has typically changed his service plan at a Verizon corporate-owned store. Mr. St.Jarre has also purchased a few mobile phones over the years for his Verizon account. Prior to 2013, Mr. St.Jarre purchased phones directly from Verizon, typically in a Verizon corporate-owned store. After 2013, Mr. St.Jarre purchased new phones from his local Costco for use with his Verizon account, including two or three iPhones.  Prior to 2016, Mr. St.Jarre would commit to 2-year service contracts with Verizon each time he purchased a mobile phone, and he would pay for his phone upfront. When Mr. St.Jarre purchased his current iPhone 7 from Costco in or around 2017, he purchased the phone on a monthly installment plan which was charged to his Verizon monthly bill.

432.    Each and every time that Mr. St.Jarre changed his wireless service plan, Verizon prominently advertised and quoted, to Mr. St.Jarre and the public, a particular monthly price for

the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Mr. St.Jarre did not include the Administrative Charge, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Mr. St.Jarre purchased a new mobile phone from Verizon or from Costco, at no point before or during the process was the Administrative Charge disclosed to him.

433. Until about a year ago, Mr. St.Jarre had always been enrolled in paper billing, and he paid his bill each month by sending Verizon a check in the mail. As described in detail above, Verizon's paper bills do not contain a line item or a listed amount for the Administrative Charge.

434. About a year ago, Mr. St.Jarre signed up for electronic billing and Auto Pay, as Verizon encouraged him to do. Through this billing process, Mr. St.Jarre receives a monthly Verizon text message and billing email which states his bill total and informs him that his bill will be automatically paid by the payment due date because he has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. As alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Mr. St.Jarre that Verizon was adding an Administrative Charge to his bill each month or disclose the true nature or basis of the charge.

435. Mr. St.Jarre first learned of the Administrative Charge's existence several years ago. Based on the location of the Administrative Charge on the bill he examined, Mr. St.Jarre believed that the Administrative Charge was a pass-through cost that Verizon was required to charge. As described in detail above, the first page of the bill falsely states that "Surcharges" (which is how Verizon labels the Administrative Charge) are to "cover the costs that are billed to us by federal, state or local governments."

436. When Mr. St.Jarre agreed to purchase his Verizon service plans, he was relying

on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Mr. St.Jarre did not expect (and he was never told) that Verizon would actually charge him a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to him. Had he known that information he would not have been willing to pay as much for his plans and would have acted differently.

437.    Mr. St.Jarre has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Mr. St.Jarre believes that he was given the services Verizon promised him—just not at the price Verizon promised and advertised to him.

438.    Mr. St.Jarre remains a Verizon postpaid wireless customer as of this filing. Mr. St.Jarre desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Mr. St.Jarre wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Mr. St.Jarre wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Mr. St.Jarre will be harmed if, in the future, he is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to him.

**Plaintiff Gloria Stern**

439.    Plaintiff Gloria Stern is, and at all relevant times has been, a citizen and resident of Temecula, California.

440.    Ms. Stern has been a continuous Verizon postpaid wireless customer for over 20 years. She and her husband initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store in California. They signed up for two-year service contracts for

two lines. They also purchased two new phones along with the service contracts, as part of a bundle.

441.     When Ms. Stern purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Stern and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Stern, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

442.     Verizon charged Ms. Stern an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Stern did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

443.     Verizon has continued to charge Ms. Stern an Administrative Charge every month from September 2005 through the present.

444.     During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Stern several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

445.     Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Stern a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

446.     Ms. Stern has been subscribed to Verizon's "Unlimited 55+ Loyalty" wireless plan for many years. When Ms. Stern's husband passed away approximately 3 years ago, Ms. Stern's daughter began using that second line on the plan.

447.     Ms. Stern has purchased a few mobile phones over the years directly from Verizon, including in a Verizon corporate-owned store and from the Verizon website.

Ms. Stern has also purchased a phone from Costco for use with her Verizon account. Prior to 2014, Ms. Stern would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. In 2020, Ms. Stern bought an iPhone XR and an iPhone 11 from the Verizon website, which she purchased on 24-payment device installment plans to be billed monthly to her account. Each time that Ms. Stern purchased a new mobile phone directly from Verizon or from Costco, at no point before or during the process was the Administrative Charge disclosed to her.

448.    For many years, Ms. Stern has been signed up for electronic billing, as Verizon encouraged her to do. Each month, Ms. Stern receives a text message notification from Verizon informing her that her monthly service bill is ready and stating only the total dollar amount of the bill. Up until about 10 months ago, Ms. Stern then paid her bill by logging into her My Verizon account and submitting payment. Approximately 10 months ago, Ms. Stern signed up for Auto Pay when she purchased her current iPhone XR and Verizon at that time offered her an Auto Pay discount on her bill.

449.    Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge.

450.    Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Stern that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

451.    Ms. Stern did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in December 2021.

452.    When Ms. Stern agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Stern did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been

material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

453.    Ms. Stern has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Stern believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

454.    Ms. Stern remains a Verizon postpaid wireless customer as of this filing. Ms. Stern desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Stern wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Stern wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Stern will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Edna Toy**

455.    Plaintiff Edna Toy is, and at all relevant times has been, a citizen and resident of Sacramento, California.

456.    Ms. Toy has been a continuous Verizon postpaid wireless customer for over 20 years. She initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store located in San Francisco, California. She signed up for a two-year service contract for one line for herself. She also purchased a new phone along with the service contract, as part of a bundle.

457.    When Ms. Toy purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Toy and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Toy, at any time before or when she signed up, that

Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

458. Verizon charged Ms. Toy an Administrative Charge since Verizon first began sneaking the Administrative Charge into all of its postpaid wireless customers' bills September 2005. Ms. Toy did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

459. Verizon has continued to charge Ms. Toy an Administrative Charge every month from September 2005 through the present.

460. During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Toy several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

461. Through its imposition of the Administrative Charge, Verizon has for 17 years charged Ms. Toy a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

462. Ms. Toy has changed her Verizon service plan a few times over the years, including adding a second line for her daughter around 10 years ago. When Ms. Toy has changed or updated her Verizon plan, she has typically done so in a corporate-owned Verizon store or on the telephone with Verizon customer service. Ms. Toy has also purchased several mobile phones over the years for her Verizon account, either directly from Verizon at a corporate-owned store or on the Verizon website, or at the Verizon kiosk at her local Costco. Prior to 2014, Ms. Toy would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. Most recently, she purchased a Samsung Galaxy Note10 Plus phone at Costco in November 2019. She entered into a 24-payment device installment plan for the phone which was billed monthly to her Verizon account.

463. Each and every time that Ms. Toy changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Toy and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Toy did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Toy purchased a new mobile phone from Verizon, at no point before or during the process was the Administrative Charge disclosed to her.

464. Ms. Toy has always been enrolled in paper billing. Each month, Ms. Toy receives a paper bill in the mail from Verizon. Ms. Toy then logs into her My Verizon account on Verizon's website to pay her bill. As described in detail above, Verizon's paper bills do not contain a line item or a listed amount for the Administrative Charge. Also as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's paper billing statements and electronic billing process did not inform or adequately disclose to Ms. Toy that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

465. Ms. Toy did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in December 2021.

466. When Ms. Toy agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Toy did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

467. Ms. Toy has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Toy believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

468. Ms. Toy remains a Verizon postpaid wireless customer as of this filing. Ms. Toy desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. Toy wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Toy wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Toy will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Teresa Toy**

469. Plaintiff Teresa Toy is, and at all relevant times has been, a citizen and resident of San Bruno, California.

470. Ms. Toy has been a continuous Verizon postpaid wireless customer since in or around April 2005. She initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store located in San Bruno, California. She signed up for a two-year service contract for one line for herself. She also purchased a new phone along with the service contract, as part of a bundle.

471. When Ms. Toy purchased her wireless service plan, Verizon prominently advertised and quoted, to Ms. Toy and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. Toy, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

472.     Verizon began charging Ms. Toy an Administrative Charge in September 2005, a few months after she first signed up. Ms. Toy did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

473.     Verizon has continued to charge Ms. Toy an Administrative Charge every month from September 2005 through the present.

474.     During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. Toy several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

475.     Through its imposition of the Administrative Charge, Verizon has for 16 years charged Ms. Toy a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

476.     Ms. Toy has changed her Verizon service plan a few times over the years, including adding two more lines for her children. Ms. Toy has also purchased several mobile phones over the years for use with her Verizon account, typically from the Verizon kiosk at her local Costco or from the Apple Store.

477.     Prior to 2014, Ms. Toy would commit to 2-year service contracts with Verizon each time she purchased a mobile phone. From 2014 up until a couple of years ago, each time Ms. Toy purchased a new phone she entered into a 24-payment device installment plan with Verizon to pay for the phone. However, a couple of years ago Verizon informed her that going forward, in order to sign up for Verizon's device installment plans she would have to switch her older wireless service plan to a newer Verizon "Unlimited" plan—which she did not want to do. Thus, for the past couple of years, in order to keep her existing service plan, Ms. Toy has paid upfront (without an installment plan) for all of her new phones at Costco or at the Apple Store.

478. Each time that Ms. Toy changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. Toy and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. Toy did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. Toy purchased a new mobile phone directly from Verizon or from Costco or from the Apple Store, at no point before or during the Verizon-created process was the Administrative Charge disclosed to her.

479. For many years, Ms. Toy has been signed up for electronic billing, as Verizon encouraged her to do. Each month, Ms. Toy receives an email notification from Verizon informing her that her monthly service bill is ready and stating only the total dollar amount of the bill. Up until about one year ago, Ms. Toy then paid her bill by logging into her My Verizon account and submitting payment. Approximately one year ago, Ms. Toy signed up for Auto Pay, as Verizon encouraged her to do.

480. As alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge.

481. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. Toy that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

482. Ms. Toy did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in November 2021.

483. When Ms. Toy agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. Toy did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone

line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her plans and would have acted differently.

484. Ms. Toy has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. Toy believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

485. Ms. Toy remains a Verizon postpaid wireless customer as of this filing. Ms. Toy does not have feasible options other than Verizon for good wireless service coverage in her geographic area in San Bruno, California. Ms. Toy desires to sign up for different Verizon postpaid wireless service plans in the future. However, Ms. Toy wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. Toy wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. Toy will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

**Plaintiff Vanessa West**

486. Plaintiff Vanessa West is a citizen and resident of Woodland Hills, California.

487. Ms. West has had a postpaid account with Verizon since around 2014. Ms. West initially signed up for Verizon postpaid wireless service in a Verizon corporate-owned store located in California. At that time, she signed up for a two-year service contract for one line for herself. In 2016, Ms. West and her husband (who was then her fiancé) together established a new joint account with Verizon; Ms. West moved her existing Verizon phone line over to this new account. Although the account was listed under her husband's name, Ms. West has always been the person who managed and made payments on the Verizon account.

488.    When Ms. West purchased her wireless service plan in 2014, and when she transferred her phone line to the new joint account with her husband in 2016, Verizon prominently advertised and quoted, to Ms. West and the public, that the plan would cost a particular monthly price. Verizon did not disclose to Ms. West, at any time before or when she signed up, that Verizon would or might later add an Administrative Charge on top of the advertised and promised monthly price.

489.    Verizon charged Ms. West an Administrative Charge since she first signed up for Verizon service. Ms. West did not receive notice or adequate notice that the Administrative Charge would be charged or regarding the true nature or basis of the charge.

490.    Verizon has continued to charge Ms. West an Administrative Charge every month from 2014 through the present.

491.    During that time, Verizon has increased the amount of the Administrative Charge charged to Ms. West several times. Until December 2015, the Administrative Charge remained under a dollar per line each month. In December 2015, Verizon increased the Administrative Charge from $0.95 to $1.23 per line each month. In August 2019, Verizon raised the Administrative Charge to $1.78 per line each month. In August 2020, Verizon once again increased the Administrative Charge, this time to $1.95 per line each month, which is the current amount as of this filing.

492.    Through its imposition of the Administrative Charge, Verizon has for over 7 years charged Ms. West a higher price for her service plans each month than Verizon advertised and that she was promised and expected to pay.

493.    Ms. West has changed her Verizon service plan a few times over the years, including moving her phone line over to the new joint account with her husband in 2016. Ms. West has also purchased several mobile phones over the years at Verizon corporate-owned stores or from the Apple Store. Ms. West typically purchased new phones on 24-payment device installment plans with Verizon, including the iPhone 8 she purchased for herself in 2017 at the Verizon corporate-owned store in Sherman Oaks, and the iPhone 13 she purchased for her husband in or around September 2021 from the Apple Store.

494. Each time that Ms. West changed her wireless service plan, Verizon prominently advertised and quoted, to Ms. West and the public, a particular monthly price for the wireless service plan, and did not disclose the Administrative Charge. The price that Verizon quoted and stated to Ms. West did not include the Administrative Charge, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Charge). Nor did Verizon disclose that the total price would or might increase as a result of increases to the Administrative Charge. Likewise, each time that Ms. West purchased a new mobile phone directly from Verizon or from the Apple Store, at no point before or during the Verizon-created process was the Administrative Charge disclosed to her.

495. Ms. West has been signed up for electronic billing and Auto Pay for many years, as Verizon encouraged her to do. Through this billing process, Ms. West receives a monthly Verizon billing email which states her bill total and informs her that her bill will be automatically paid by the payment due date because she has Auto Pay. Verizon's Auto Pay feature discourages customers from reviewing their monthly bill. Meanwhile, as alleged above, Verizon's electronic billing, the My Verizon online billing center and payment process, and the full online PDF monthly billing statements are deliberately designed in a manner to hide and disguise the Administrative Charge. Verizon's monthly electronic billing process and monthly statements did not inform or adequately disclose to Ms. West that Verizon was adding an Administrative Charge to her bill each month or disclose the true nature or basis of the charge.

496. Ms. West did not learn of the Administrative Charge's existence until it was brought to her attention by her counsel in November 2021.

497. When Ms. West agreed to purchase her Verizon service plans, she was relying on Verizon's prominent representations, in each instance, regarding the monthly price of the service plans. Ms. West did not expect (and she was never told) that Verizon would actually charge her a so-called Administrative Charge on top of the advertised service plan price or that the true price of the services would include an additional Administrative Charge for each phone line which Verizon could and would increase at its desire. That information would have been material to her. Had she known that information she would not have been willing to pay as

much for her plans and would have acted differently.

498.    Ms. West has a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Ms. West believes that she was given the services Verizon promised her—just not at the price Verizon promised and advertised to her.

499.    Ms. West remains a Verizon postpaid wireless customer as of this filing. Ms. West desires to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. However, Ms. West wants to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Ms. West wants to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Ms. West will be harmed if, in the future, she is left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to her.

## VI.    CLASS ALLEGATIONS

500.    Plaintiffs bring this lawsuit on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

501.    Plaintiffs seek to represent the following Class:

**All individual consumers in California who currently subscribe or formerly subscribed to a postpaid wireless service plan from Verizon and were charged what Verizon labeled an "Administrative Charge" within the applicable statutes of limitations.**

502.    *This Court should apply the discovery rule to extend any applicable limitations period (and the corresponding class period) to the date on which Verizon first began charging the Administrative Charge (which, based on the investigation of Plaintiffs' counsel, is September 2005).* The nature of Verizon's misconduct was non-obvious and intentionally concealed from its subscribers. Verizon even designed its monthly billing statements to further

its scheme and to prevent customers from realizing they were being overcharged. As a result of Verizon's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the Class could have, through the use of reasonable diligence, learned of the accrual of their claims against Verizon at an earlier time.

503. Specifically excluded from the Class are Verizon and any entities in which Verizon has a controlling interest, Verizon's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

504. **_Numerosity_**. The members of the Class are so numerous that joinder of all members would be impracticable. Plaintiffs do not know the exact number of Class members prior to discovery. However, there are at least one million Class members. The exact number and identities of Class members are contained in Verizon's records and can be easily ascertained from those records.

505. **_Commonality and Predominance_**. This action involves multiple common questions which are capable of generating class-wide answers that will drive the resolution of this case. These common questions predominate over any questions affecting individual Class members, if any. These common questions include, but are not limited to, the following:

    a. Whether Verizon employs a uniform policy of charging the Administrative Charge to its California customers;

    b. Whether Verizon adequately and accurately disclosed the existence of the Administrative Charge, its nature or basis, or its amount, to Plaintiffs and the Class;

    c. What is the nature or purpose of the Administrative Charge;

    d. Whether Verizon's descriptions of the Administrative Charge are false and/or misleading;

    e. Whether and to what extent the Administrative Charge is a surcharge imposed on subscribers to "cover the costs that are billed to us by federal, state or local governments,"

    f. Whether the Administrative Charge and the true price of Verizon's

postpaid wireless services are material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

g. Why does Verizon not include the amount of the Administrative Charge in the advertised and quoted service plan price;

h. Why does Verizon not disclose the existence or amount of the Administrative Charge when signing up consumers for its wireless service plans;

i. Why does Verizon not include the amount of the Administrative Charge in the total monthly service price quoted to consumers during the sign-up process for its wireless service plans;

j. Whether Verizon's policy and practice of advertising and quoting the monthly prices of its wireless service plans without including the amount of the Administrative Charge is false, deceptive, or misleading;

k. Whether a reasonable consumer is likely to be deceived by Verizon's conduct and omissions alleged herein;

l. Whether Verizon's misrepresentations and misconduct alleged herein violate California Civil Code § 1750 *et seq.* (CLRA), California Business & Professions Code § 17500 *et seq.* (FAL), and California Business & Professions Code § 17200 *et seq.* (UCL); and

m. Whether Verizon has violated the covenant of good faith and fair dealing, implied in its form contracts with Plaintiffs and the Class, by imposing and increasing the Administrative Charge in the manner alleged herein.

506. ***Typicality***. Plaintiffs' claims are typical of Class members' claims. Plaintiffs and Class members all sustained injury as a direct result of Verizon's standard practices and schemes, bring the same claims, and face the same potential defenses.

507. ***Adequacy***. Plaintiffs and their counsel will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests and are committed to representing the best interests of the Class. Moreover, Plaintiffs have retained counsel with considerable experience and success in prosecuting complex class action and consumer protection cases.

508. ***Superiority.*** A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Each Class member's interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Verizon's conduct. Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system. Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same uniform conduct. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiffs do not anticipate any difficulties in managing a class action trial.

509. By its conduct and omissions alleged herein, Verizon has acted and refused to act on grounds that apply generally to the Class, such that final private injunctive relief and/or declaratory relief is appropriate respecting the Class as a whole.

510. Verizon is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Verizon in this Complaint arises from and is limited to statements or conduct by Verizon that consist of representations of fact about Verizon's business operations or services that is or was made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in, Verizon's services or the statement is or was made in the course of delivering Verizon's services. Each cause of action brought by Plaintiffs against Verizon in this Complaint arises from and is limited to statements or conduct by Verizon for which the intended audience is an actual or potential buyer or customer, or a person likely to repeat the statements to, or otherwise influence, an actual or potential buyer or customer.

## CAUSES OF ACTION

### COUNT I
### Violation of the Consumers Legal Remedies Act ("CLRA")
### California Civil Code § 1750 *et seq.*

511. Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

512. Each Plaintiff brings this claim in his or her individual capacity, in his or her capacity as a private attorney general seeking the imposition of public injunctive relief to protect the general public, and as a representative of the Class.

513. Defendants are each a "person," as defined by Cal. Civ. Code § 1761(c).

514. Plaintiffs and Class members are each "consumers," as defined by Cal. Civ. Code §1761(d).

515. The wireless service plans that Verizon marketed and sold are "services," as defined as defined by Cal. Civ. Code § 1761(b).

516. The purchases of Verizon's wireless service plans by Plaintiffs and Class members are "transactions," as defined by Cal. Civ. Code § 1761(e).

517. Plaintiffs and Class members purchased Verizon's wireless service plans for personal, family, and/or household purposes, as meant by Cal. Civ. Code § 1761(d).

518. Venue is proper under Cal. Civil Code § 1780(d) because a substantial portion of the transactions at issue occurred in San Francisco County, which is within this federal judicial district. Plaintiffs' declarations establishing that this Court is a proper venue for this action are attached hereto as **Exhibit A.**

519. By its conduct and omissions alleged herein, Verizon has committed unlawful methods, acts or practices, including without limitation by:

a. Misrepresenting the prices of Verizon's wireless service plans and concealing the true prices of its wireless service plans;

b. Misrepresenting the prices of Verizon's wireless service plans by advertising or quoting prices that do not include the monthly Administrative Charge;

c. Failing to disclose the existence or amount of the Administrative Charge when consumers sign up for Verizon's wireless service plans;

d. Failing to *ever* adequately or accurately disclose the existence of the Administrative Charge, its nature, or its amount to its subscribers;

e. Increasing the Administrative Charge on existing customers without notice or adequate notice, including in the middle of promised fixed-rate customer contracts;

f.     Misrepresenting the nature of the Administrative Charge, including by representing or indicating that the Administrative Charge is a tax, a charge imposed to recover costs billed to Verizon by the government, a pass-through government cost, a government or regulatory fee, or a charge over which Verizon has no control; and

g.     Falsely stating on the customer bill that the Administrative Charge is a surcharge imposed to "cover the costs that are billed to us by federal, state or local governments."

520.     The unlawful methods, acts or practices alleged herein to have been undertaken by Verizon were all committed intentionally and knowingly. The unlawful methods, acts or practices alleged herein to have been undertaken by Verizon did not result from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid such error.

521.     Verizon's conduct alleged herein has violated the CLRA in multiple respects, including, but not limited to, the following:

a.     Verizon represented that its wireless service plans had characteristics that they did not have (Cal. Civ. Code § 1770(a)(5));

b.     Verizon advertised its wireless service plans with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

c.     Verizon misrepresented that its wireless service plans were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)); and

d.     Verizon inserted unconscionable provisions in its consumer agreements, including, but not limited to, an arbitration clause which waives the right to seek public injunctive relief in any forum and which impairs the ability of customers to enforce their legal rights, in violation of California law (Cal. Civ. Code § 1770(a)(19)).

522.     With respect to any omissions, Verizon at all relevant times had a duty to disclose the information in question because, inter alia: (a) Verizon had exclusive knowledge of material information that was not known to Plaintiffs and Class members; (b) Verizon concealed material information from Plaintiffs and Class members; and (c) Verizon made

partial representations, including regarding the monthly rate of its wireless service plans, which were false and misleading absent the omitted information.

523. Verizon's misrepresentations deceive and have a tendency to deceive the general public.

524. Verizon's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

525. Plaintiffs and Class members reasonably relied on Verizon's material misrepresentations, and would not have purchased, or would have paid less money for, Verizon's wireless service plans had they known the truth.

526. As a direct and proximate result of Verizon's violations of the CLRA, Plaintiffs and Class members have been damaged and have lost money or property in the amount of the Administrative Charges they have been charged and paid. Moreover, Verizon continues to charge Plaintiffs and Class members the Administrative Charge and may continue to increase its service prices via increases to the Administrative Charge.

527. Verizon's conduct alleged herein caused substantial injury to Plaintiffs, Class members, and the general public.

528. Verizon's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Verizon from committing such practices.

529. Plaintiffs lack an adequate remedy at law to prevent Verizon's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Plaintiffs desire and intend to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. Plaintiffs want to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented

discretionary monthly service charge (like it did with the Administrative Charge), Plaintiffs want to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Plaintiffs will be harmed if, in the future, they are left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to them.

530.    Monetary damages are not an adequate remedy at law for *future* harm for the following reasons.  First, damages are not an adequate remedy for future harm because they will not prevent Verizon from continuing its unlawful conduct. Second, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (1) how many wireless service lines Plaintiffs may want or need in the future (including for phones, computer tablets, or wireless hot spots); (2) what Verizon's future per-line Administrative Charge will be (given that Verizon has increased the Administrative Charge three times since 2015, doubling it from $0.95 to $1.95 thus far); or (3) how many months Plaintiffs would continue to subscribe to Verizon but for the unlawful conduct. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. Third, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts would be flooded with future lawsuits by the general public, the Class members, and the Plaintiffs for future violations of the law by Verizon.

531.    Plaintiffs, on behalf of themselves and as private attorneys general, seek public injunctive relief under the CLRA to protect the general public from Verizon's false advertisements and omissions. Specifically, Plaintiffs seek a permanent public injunction against Verizon under the CLRA as follows: (1) enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public; (2) enjoin Verizon from advertising or quoting a wireless service plan price to members of the general public if that price does not include applicable discretionary monthly service fees or charges such as the Administrative Charge; and (3) enjoin Verizon from representing or stating to members of the

public that the Administrative Charge is a tax, a charge imposed to recover costs billed to Verizon by the government, a pass-through government cost, a government or regulatory fee, or a charge over which Verizon has no control.

532.    Verizon acted with malice, fraud and oppression as defined by California Civil Code section 3294 when it intentionally and knowingly engaged in the acts or omissions pleaded in this Complaint. An officer, director or managing agent of Verizon authorized or ratified the malicious, fraudulent and oppressive conduct of others pleaded herein, or an officer, director or managing agent of Verizon personally engaged in and was guilty of the malicious, fraudulent and oppressive conduct pleaded herein. For example, Verizon has violated the law by concocting and implementing the fraudulent and deceptive Administrative Charge scheme, including by, among other things: (1) inventing the Administrative Charge out of whole cloth when it is in fact just a disguised double-charge for service; (2) misrepresenting and concealing the prices of Verizon's wireless service plans by advertising or quoting prices that do not include the monthly Administrative Charge; (3) failing to disclose the existence or amount of the Administrative Charge when consumers sign up for Verizon's wireless service plans; (4) utilizing the Administrative Charge as a revenue lever to covertly jack up its monthly service prices and to squeeze Verizon's existing subscribers for more cash whenever Verizon desires; and (5) designing the customer monthly billing statements to further Verizon's fraudulent scheme and keep customers from realizing they are being overcharged, including by presenting the Administrative Charge on the bill as something separate from the service plan price, hiding the Administrative Charge in a "Surcharges" section of the bill lumped together with government costs, and falsely stating on the customer bill that the Administrative Charge is a "surcharge" imposed on subscribers to "cover the costs that are billed to us by federal, state or local governments." Verizon intentionally engaged in the misconduct alleged in this Complaint in order to trick and deceive Plaintiffs and the Class into paying hidden and disguised double-charges for wireless service. Verizon engaged in this misconduct solely to line its own pockets and extract hundreds of millions of dollars from Plaintiffs and the Class, causing them monetary injury and depriving them of property.

533.     In accordance with California Civil Code § 1782(a), Plaintiffs, through counsel, served Verizon with notice of its CLRA violations by USPS certified mail, return receipt requested, on November 3, 2021. Verizon refused to give any correction or remedy whatsoever to Plaintiffs for their CLRA violations. Accordingly, pursuant to Sections 1780 and 1782(b) of the CLRA, Plaintiffs and the Class are entitled to recover actual damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems proper for Verizon's CLRA violations.

**COUNT II**
**Violation of California's False Advertising Law**
**California Business and Professions Code § 17500 *et seq.***

534.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

535.     Each Plaintiff brings this claim in his or her individual capacity, in his or her capacity as a private attorney general seeking the imposition of public injunctive relief to protect the general public, and as a representative of the Class.

536.     By its conduct alleged herein, Verizon has committed acts of untrue and misleading advertising, as defined by and in violation of California Business & Professions Code § 17500, *et seq.*, also known as California's False Advertising Law ("FAL"). These acts include but are not limited to:

        a.     Misrepresenting the prices of Verizon's wireless service plans and concealing the true prices of its wireless service plans in its advertising;

        b.     Misrepresenting the prices of Verizon's wireless service plans by advertising or quoting prices in its advertising that do not include the monthly Administrative Charge; and

        c.     Failing to disclose the existence or amount of the Administrative Charge in its advertising when consumers sign up for Verizon's wireless service plans.

537.     Verizon committed such violations of the FAL with actual knowledge that its advertising was misleading, or Verizon, in the exercise of reasonable care, should have known that its advertising was misleading.

538. Verizon's misrepresentations deceive and have a tendency to deceive the general public.

539. Verizon intentionally deceived Plaintiffs and Class members, and continues to deceive the public.

540. Verizon's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

541. Plaintiffs and Class members reasonably relied on Verizon's material misrepresentations, and would not have purchased, or would have paid less money for, Verizon's wireless service plans had they known the truth.

542. By its conduct and omissions alleged herein, Verizon received more money from Plaintiffs and Class members than it should have received, including the excess Administrative Charges that Verizon charged Plaintiffs and the Class on top of the advertised prices for the service plans, and that money is subject to restitution.

543. By its conduct and omissions alleged herein, Verizon caused the demand for its postpaid wireless service plans to be artificially increased and caused all customers of those plans, including Plaintiffs and the Class, to pay premiums to Verizon.

544. As a direct and proximate result of Verizon's violations of the FAL, Plaintiffs and Class members have been harmed and lost money.

545. Verizon's conduct has caused substantial injury to Plaintiffs, Class members, and the general public.

546. Verizon's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Verizon from committing such practices.

547. Plaintiffs lack an adequate remedy at law to prevent Verizon's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Plaintiffs desire and intend to sign up for different Verizon

postpaid wireless service plans and Verizon device installment plans in the future. Plaintiffs want to be confident that the advertised and quoted price for Verizon's service plans is the true and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Plaintiffs want to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Plaintiffs will be harmed if, in the future, they are left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to them.

548. Monetary damages are not an adequate remedy at law for *future* harm for the following reasons. <u>First</u>, damages are not an adequate remedy for future harm because they will not prevent Verizon from continuing its unlawful conduct. <u>Second</u>, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (1) how many wireless service lines Plaintiffs may want or need in the future for various wireless devices; (2) what Verizon's future per-line Administrative Charge will be (given that Verizon has increased the Administrative Charge three times since 2015, doubling it from $0.95 to $1.95 thus far); or (3) how many months Plaintiffs would continue to subscribe to Verizon but for the unlawful conduct. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. <u>Third</u>, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts would be flooded with future lawsuits by the general public, the Class members, and the Plaintiffs for future violations of the law by Verizon.

549. Plaintiffs, on behalf of themselves and as private attorneys general, seek public injunctive relief under the FAL to protect the general public from Verizon's false advertising. Specifically, Plaintiffs seek a permanent public injunction against Verizon under the FAL as follows: (1) enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public; (2) enjoin Verizon from advertising or quoting a wireless

service plan price to members of the general public if that price does not include applicable discretionary monthly service fees or charges such as the Administrative Charge; and (3) enjoin Verizon from representing or stating to members of the public that the Administrative Charge is a tax, a charge imposed to recover costs billed to Verizon by the government, a pass-through government cost, a government or regulatory fee, or a charge over which Verizon has no control.

550. Plaintiffs seek an order granting restitution to Plaintiffs and Class members in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

### COUNT III
### Violation of California's Unfair Competition Law
### California Business and Professions Code § 17200 *et seq.*

551. Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

552. Each Plaintiff brings this claim in his or her individual capacity, in his or her capacity as a private attorney general seeking the imposition of public injunctive relief to protect the general public, and as a representative of the Class.

553. California Business & Professions Code § 17200, *et seq.*, also known as California's Unfair Competition Law (UCL), prohibits any unfair, unlawful, or fraudulent business practice.

554. Verizon has violated the UCL by engaging in the following ***unlawful*** business acts and practices:

a. Making material misrepresentations in violation of Cal. Civ. Code §§ 1770(a)(5), (9) and (16) (the CLRA);

b. Inserting unconscionable provisions in its consumer agreements in violation of Cal. Civ. Code § 1770(a)(19) (the CLRA), including, but not limited to, an arbitration clause which waives the right to seek public injunctive relief in any forum and which impairs the ability of customers to enforce their legal rights, in violation of California law;

1            c.        Making material misrepresentations in violation of Cal. Bus. & Prof.

2    Code § 17500 *et seq.* (the FAL); and

3            d.        Engaging in deceit in violation of Cal Civ. Code §§ 1709–1710.

4    555.    Verizon has violated the UCL by engaging in the following ***unfair*** and

5    ***fraudulent*** business acts and practices:

6            a.        Misrepresenting the prices of Verizon's wireless service plans and

7    concealing the true prices of its wireless service plans;

8            b.        Misrepresenting the prices of Verizon's wireless service plans by

9    advertising or quoting prices that do not include the monthly Administrative Charge;

10           c.        Failing to disclose the existence or amount of the Administrative Charge

11   when consumers sign up for Verizon's wireless service plans;

12           d.        Failing to *ever* adequately or accurately disclose the existence of the

13   Administrative Charge, its nature, or its amount to its subscribers;

14           e.        Increasing the Administrative Charge on existing customers without

15   notice or adequate notice, including in the middle of promised fixed-rate customer contracts;

16           f.        Misrepresenting the nature of the Administrative Charge, including by

17   representing or indicating that the Administrative Charge is a tax, a charge imposed to recover

18   costs billed to Verizon by the government, a pass-through government cost, a government or

19   regulatory fee, or a charge over which Verizon has no control; and

20           g.        Falsely stating on the customer bill that the Administrative Charge is a

21   surcharge imposed to "cover the costs that are billed to us by federal, state or local

22   governments."

23   556.    Verizon's misrepresentations were likely to mislead reasonable consumers.

24   557.    Verizon's misrepresentations deceive and have a tendency to deceive the general

25   public.

26   558.    Verizon's misrepresentations are material, in that a reasonable person would

27   attach importance to the information and would be induced to act on the information in making

28   purchase decisions.

559.    Verizon intentionally deceived Plaintiffs and Class members, and continues to deceive the public.

560.    Plaintiffs and Class members reasonably relied on Verizon's material misrepresentations, and would not have purchased, or would have paid less money for, Verizon's wireless service plans had they known the truth.

561.    By its conduct alleged herein, Verizon received more money from Plaintiffs and Class members than it should have received, including the excess Administrative Charges that Verizon charged Plaintiffs and the Class on top of the advertised prices for the service plans, and that money is subject to restitution.

562.    As a direct and proximate result of Verizon's unfair, unlawful, and fraudulent conduct, Plaintiffs and Class members lost money.

563.    Verizon's conduct alleged herein is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiffs, Class members, and the general public. Perpetrating a years-long scheme of misleading and overcharging customers is immoral, unethical, and unscrupulous. Moreover, Verizon's conduct is oppressive and substantially injurious to consumers. By its conduct alleged herein, Verizon has improperly extracted hundreds of millions of dollars from the Class. There is no utility to Verizon's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm to consumers caused by Verizon's conduct alleged herein.

564.    Verizon's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Verizon from committing such practices.

565.    Plaintiffs lack an adequate remedy at law to prevent Verizon's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Plaintiffs desire and intend to sign up for different Verizon postpaid wireless service plans and Verizon device installment plans in the future. Plaintiffs want to be confident that the advertised and quoted price for Verizon's service plans is the true

and full price for the services (i.e., that it includes all applicable discretionary monthly service charges such as the Administrative Charge). And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Plaintiffs want to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price. Plaintiffs will be harmed if, in the future, they are left to guess as to whether Verizon's representations are accurate and whether there are omissions of material facts regarding the wireless service plans being advertised and represented to them.

566.    Monetary damages are not an adequate remedy at law for *future* harm for the following reasons.  First, damages are not an adequate remedy for future harm because they will not prevent Verizon from continuing its unlawful conduct. Second, damages for future harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (1) how many wireless service lines Plaintiffs may want or need in the future for various wireless devices; (2) what Verizon's future per-line Administrative Charge will be (given that Verizon has increased the Administrative Charge three times since 2015, doubling it from $0.95 to $1.95 thus far); or (3) how many months Plaintiffs would continue to subscribe to Verizon but for the unlawful conduct. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. Third, injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts would be flooded with future lawsuits by the general public, the Class members, and the Plaintiffs for future violations of the law by Verizon.

567.    Plaintiffs, on behalf of themselves and as private attorneys general, seek public injunctive relief under the UCL to protect the general public from Verizon's false advertising. Specifically, Plaintiffs seek a permanent public injunction against Verizon under the UCL as follows: (1) enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public; (2) enjoin Verizon from advertising or quoting a wireless service plan price to members of the general public if that price does not include applicable discretionary monthly service fees or charges such as the Administrative Charge; and (3) enjoin

Verizon from representing or stating to members of the public that the Administrative Charge is a tax, a charge imposed to recover costs billed to Verizon by the government, a pass-through government cost, a government or regulatory fee, or a charge over which Verizon has no control.

568.     Plaintiffs seek an order granting restitution to Plaintiffs and Class members in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

## COUNT IV
### Breach of the Implied Covenant of Good Faith and Fair Dealing

569.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 510, inclusive, as though alleged in full in this Count.

570.     Plaintiffs allege this cause of action in the alternative.

571.     To the extent any applicable contract could be read as granting Verizon discretion to impose and/or increase the Administrative Charge—which Plaintiffs do not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by California law.

572.     Verizon has violated the covenant of good faith and fair dealing by its conduct alleged herein.

573.     Verizon has abused any discretion it purportedly had under any applicable contract to impose or increase the Administrative Charge. For example:

a.     Verizon imposed and has increased the Administrative Charge as a covert way to increase customers' monthly rates without having to advertise such higher rates;

b.     Verizon has increased the Administrative Charge to covertly and improperly squeeze additional cash from existing subscribers at Verizon's desire;

c.     Verizon omits the Administrative Charge and its amount from the mailed paper version of the bill; and

d.     On the full PDF version of the bill (which is only available online), Verizon lists the Administrative Charge next to actual government costs and falsely describes

the Administrative Charge as a surcharge imposed to cover costs billed to Verizon by the government.

574. Verizon meanwhile utilizes the activation fee, restocking fee, early termination fee, and installment balloon payment as ways to penalize and discourage customers from freely cancelling their services if they learn that Verizon has charged them more than promised for its services via imposition of, and/or increases to, the Administrative Charge. And Verizon's policies (including the cancellation/return periods and how they relate to the timing of the billing statements) are deliberately and knowingly designed by Verizon to lock customers in if and when they deduce that they are being charged more per month than promised.

575. Verizon's imposition and increasing of the Administrative Charges defied customers' reasonable expectations, was objectively unreasonable, and frustrated the basic terms of the parties' agreement. Verizon's conduct and actions alleged herein were done in bad faith.

576. Verizon's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and Class members the full benefit of their bargains with Verizon.

577. Plaintiffs and the Class members have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Verizon. There is no legitimate excuse or defense for Verizon's conduct.

578. Any attempts by Verizon to defend its overcharging through reliance on supposed contractual provisions will be without merit. Any such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and are unenforceable in light of the deceptive and hidden nature of Verizon's misconduct, among other reasons. Any such provisions, if any, would not excuse Verizon's abuses of discretion or otherwise preclude Plaintiffs and the Class from recovering for breaches of the covenant of good faith and fair dealing.

579. Plaintiffs and members of the Class sustained damages as a result of Verizon's breaches of the covenant of good faith and fair dealing. Plaintiffs seek damages in the amount

of the Administrative Charges paid by Plaintiffs and the Class members.

## **PRAYER FOR RELIEF**

**Public Injunctive Relief:**

A.       In order to prevent injury to the general public, Plaintiffs individually, and as private attorneys general, request that the Court enter a public injunction against Verizon under the CLRA, FAL, and UCL as follows:

1.       Permanently enjoin Verizon from falsely advertising the prices of its wireless service plans to members of the general public;

2.       Permanently enjoin Verizon from advertising or quoting a wireless service plan price to members of the general public if that price does not include applicable discretionary monthly service fees or charges such as the Administrative Charge;

3.       Permanently enjoin Verizon, including Verizon's sales and customer service agents, from representing or stating to members of the general public that the Administrative Charge is any of the following: (a) a tax; (b) a charge imposed to recover costs billed to Verizon by federal, state or local governments; (c) a pass-through government cost; (d) a government or regulatory fee; or (e) a charge over which Verizon has no control; and

4.       Retain jurisdiction to monitor Verizon's compliance with the permanent public injunctive relief requested hereinabove.

**Individual And Class Relief:**

B.       On behalf of themselves and the proposed Class, Plaintiffs request that the Court order relief and enter judgment against Verizon as follows:

1.       Declare this action to be a proper class action, certify the proposed Class, and appoint Plaintiffs and their counsel to represent the Class;

2.       Order that the discovery rule applies to extend any applicable limitations period (and the corresponding class period) to the date on which Verizon first began charging the Administrative Charge (which, based on the investigation of Plaintiffs' counsel, is September 2005);

3.       Order disgorgement and/or restitution, including, without limitation,

disgorgement of all revenues, profits and/or unjust enrichment that Verizon obtained, directly or indirectly, from Plaintiffs and the Class members as a result of the unlawful conduct alleged herein;

4.     Order Verizon to pay damages to Plaintiffs and the Class in the amount they paid in Administrative Charges;

5.     Order Verizon to pay punitive or exemplary damages to Plaintiffs and the Class members in an amount according to proof;

6.     Order the following Private Injunctive Relief:

a.     Order Verizon to adequately and accurately disclose to its subscribers the existence of the Administrative Charge, its true nature or basis, and its amount, including on all of Verizon's customer bills;

b.     Permanently enjoin Verizon from misrepresenting the nature of the Administrative Charge on its customer bills, including by: (a) stating it is a surcharge imposed to "cover the costs that are billed to us by federal, state or local governments"; (b) grouping the Administrative Charge on the bill together with actual government costs or taxes billed to Verizon; and (c) failing to include the Administrative Charge or its amount in the "Monthly charges and credits" section of the bill; and

7.     Retain jurisdiction to monitor Verizon's compliance with the permanent private injunctive relief requested hereinabove (Prayer, ¶ B(6)).

**<u>Other Relief:</u>**

C.     On behalf of themselves and the proposed Class, and in their capacities as private attorneys general, Plaintiffs request that the Court order relief as follows:

1.     Order Verizon to pay attorneys' fees, costs, and pre-judgment and post-judgment interest to the extent allowed by law; and

2.     Grant such other relief as this Court deems just and proper.

# DEMAND FOR JURY TRIAL

Each Plaintiff, individually, as a private attorney general to protect the general public, and as a class representative on behalf of all others similarly situated, demands a trial by jury on all issues so triable.

DATED this 20th day of July, 2022.

Presented by:

HATTIS & LUKACS

By: */s/ Daniel M. Hattis*
Daniel M. Hattis (SBN 232141)
Paul Karl Lukacs (SBN 197007)
Che Corrington (admitted *pro hac vice*)
HATTIS & LUKACS
400 108th Ave NE, Ste 500
Bellevue, WA 98004
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com
Email: che@hattislaw.com

Stephen P. DeNittis, Esq. (admitted *pro hac vice*)
DENITTIS OSEFCHEN PRINCE, P.C.
5 Greentree Centre, Suite 410
525 Route 73 N.
Marlton, New Jersey 08057
Telephone: (856) 797-9951
Facsimile: (856) 797-9978
Email: sdenittis@denittislaw.com

*Attorneys for Plaintiffs*
*and the Proposed Class*